**R.F.M.A.S., INC., Plaintiff,**

v.

**MIMI SO et al., Defendants.**

**No. 06 Civ. 13114(VM).**

United States District Court, S.D. New York.

May 13, 2009.

See also 606 F.Supp.2d 497.

**46**

Kenneth S. Feldman, Law Offices of Stephen E. Feldman, P.C., Stephen Edward Feldman, Paul J. Burgo, Steven Michael Crosby, Feldman Law Group, New York, NY, Kevin P. Crosby, Brinkley, Morgan, Solomon, Tatum, Stanley, Lunny & Crosby, Fort Lauderdale, FL, Steven Michael Crosby, Kilgore & Kilgore, PLLC, Dallas, TX, for Plaintiff.

Paul J. Sutton, David Jonathan Saenz, Greenberg, Traurig, L.L.P., Barry George Magidoff, Sutton Magidoff, LLP, Evan Gourvitz, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, for Defendants.

## DECISION AND AMENDED ORDER

VICTOR MARRERO, District Judge.

## TABLE OF CONTENTS

PAGE

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
 A. CREATION OF THE STELLA JEWELRY LINE . . . . . . . . . . . . . . . . . . . . . . . . 48
 B. RHI'S ACQUISITION OF MSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
 C. RICHEMONT'S POSSIBLE ACQUISITION OF RFMAS . . . . . . . . . . . . . . . . . 49
 D. CREATION OF THE GATE B9 JEWELRY LINE . . . . . . . . . . . . . . . . . . . . . . 49
 E. RFMAS'S SUPPLEMENTARY REGISTRATION . . . . . . . . . . . . . . . . . . . . . 50

II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
 A. LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
 B. SPOLIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
 C. RFMAS'S OWNERSHIP OF A VALID COPYRIGHT . . . . . . . . . . . . . . . . . . . 51
 1. Originality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
 2. Presumption of Validity of the Copyright and Facts Stated in the
 Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
 3. Registration of a Jewelry Collection In a Single Application . . . . . . . . . . . . . . 58
 4. First Publication in Italy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
 D. UNAUTHORIZED COPYING OF THE STELLA PIECES . . . . . . . . . . . . . . . . . 61
 1. Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
 2. Substantial Similarity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
 3. Liability of the Richemont Defendants For Copyright Infringement . . . . . . 66
 a. Direct Infringement by the Richemont Defendants . . . . . . . . . . . . . . . . . 66
 b. Indirect Infringement by the Richemont Defendants . . . . . . . . . . . . . . . . 69
 i. Vicarious Infringement by the Richemont Defendants . . . . . . . . . . . . 71
 ii. Contributory Infringement by the Richemont Defendants . . . . . . . . 72
 E. TRADE DRESS INFRINGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
 1. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
 2. Articulation of Trade Dress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
 3. Functionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
 4. Secondary Meaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
 5. Likelihood of Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
 6. Liability of the Richemont Defendants For Trade Dress Infringement . . . . . . 83
 a. Direct Infringement by the Richemont Defendants . . . . . . . . . . . . . . . . . 83
 b. Contributory Infringement by the Richemont Defendants . . . . . . . . . . . . 84
 F. UNFAIR COMPETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
 G. MISAPPROPRIATION OF TRADE SECRETS . . . . . . . . . . . . . . . . . . . . . . . 86
 H. BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
 I. UNJUST ENRICHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

III. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Plaintiff R.F.M.A.S., Inc. ("RFMAS") brought this action against defendants Mimi So, Mimi So International, Inc., Richemont SA, Compagnie Financière Richemont SA, Richemont North America, Richemont Holdings I, and Richemont International, Ltd. (collectively, "Defendants"), alleging, among other things, that Defendants infringed RFMAS's copyright in nine pieces of its "Stella" jewelry line (the "Stella Pieces") and infringed the trade dress of the "look" of the Stella collection.

On August 11, 2008, RFMAS filed a motion for summary judgment against Mimi So ("So") and Mimi So International, Inc. ("MSI") (collectively, the "So Defendants"), alleging that certain pieces in the So Defendants' "Gate B9" jewelry line directly infringe RFMAS's copyright in the Stella Pieces. In addition, RFMAS's motion asks the Court to rule as a matter of law that RFMAS's copyright in the Stella Pieces is valid, and that the So Defendants accessed the jewelry. On the same date, RFMAS filed a separate motion for summary judgment[1] against Richemont SA, Compagnie Financière Richemont SA ("Compagnie Financière"), Richemont North America ("Richemont NA"), Richemont Holdings I ("RHI"), and Richemont International, Ltd. ("Richemont Int'l") (collectively, the "Richemont Defendants"), alleging that the Richemont Defendants contributorily and vicariously infringed RFMAS's copyright in the design of the Stella Pieces, and again asks the Court to rule as a matter of law that its copyright in the Stella Pieces is valid, and that the Richemont Defendants accessed the jewel-

ry. Both of RFMAS's motions discuss at length the alleged spoliation of evidence committed by Defendants. RFMAS asks the Court to grant summary judgment in RFMAS's favor or to strike Defendants' answers to the complaint as a sanction for the alleged spoliation.

Also on August 11, 2008, the So Defendants and the Richemont Defendants each filed a motion for summary judgment against RFMAS. The So Defendants assert that: (1) RFMAS's copyright registration is not valid and that RFMAS is not entitled to any presumption of validity based on the registration; (2) RFMAS's copyright infringement claim fails for lack of substantial similarity; and (3) as a matter of law, RFMAS's trade dress and unfair competition claims must fail. The Richemont Defendants ask the Court to rule that: (1) they did not directly or indirectly infringe the copyright in the Stella Pieces; and (2) they are not liable for trade dress infringement, misappropriation of trade secret information, breach of contract, or unjust enrichment.

By Order dated March 30, 2009 (the "March 30 Order") the Court denied RFMAS's motions, granted in part and denied in part the So Defendants' motion, and granted in part and denied in part the Richemont Defendants' motion. The Court now sets forth its findings, reasoning, and conclusions in support of the March 30 Order.

## I. BACKGROUND[2]

While very few facts are undisputed by the parties in this action, the Court now

---

1. Although RFMAS's only docketed Notice of Motion (Docket No. 97) states that it is moving for summary judgment against "the Mimi So Defendants," RFMAS filed two separate memoranda of law, one against the So Defendants and one against the Richemont Defen-

dants, each purporting to be in support of motions for summary judgment against those particular defendants.

2. The factual and procedural summary provided below is derived primarily from the

presents a brief summary of the general history of this case, and will present further details where relevant in its analysis of the issues.

## A. CREATION OF THE STELLA JEWELRY LINE

Amedeo Scognamiglio ("Scognamiglio") and Roberto Faraone Mennella ("Mennella")[3] are the founders, principals, and sole shareholders of RFMAS, a company that designs, markets, and sells jewelry. Scognamiglio and Mennella allege that they designed, created, and first published a collection of jewelry in Italy in 2001, which included several pieces they refer to as the "Stella" collection. Defendants, however, contend that the Stella collection may have been created and first published in the United States in 2002.

On April 28, 2004, RFMAS filed a copyright application (the "Application") with the United States Copyright Office. In the Application, RFMAS provided the following information:

*Section 1:* Under the heading "Title of This Work," the Application provides "COLLECTIONS I," and under "Nature of This Work," the Application provides "JEWELRY DESIGNS."

*Section 2(a):* Under the heading "Name of Author," the Application provides "R.F.M.A.S., INC. D/B/A FARAONE MANNELLA." Under the question "Was this contribution to the work a 'work made for hire'?" the box marked "Yes" is checked. Under "Author's Nationality or Domicile," the Application provides that the author is a citizen of "USA." Section 2(b) is not completed.

*Section 3(a):* Under the heading "Year in Which Creation of This Work Was Completed," the Application provides "2002."

*Section 3(b):* Under the heading "Date and Nation of First Publication of This Particular Work," the Application provides "MAY 1, 2002." The Application does not provide the nation of first publication.

Attached to the Application, as the deposit for the registration, are fifty-four photographs of various items of jewelry, including necklaces, earrings, bracelets, and rings. The Copyright Office assigned RFMAS Copyright Registration No. VA–1–260–162 (the "Registration") on April 28, 2004. (*See* Declaration of Christopher B. Prescott, dated August 11, 2008 ("Prescott Aug. Decl."), Ex. 5.)

---

following documents, and any exhibits or declarations submitted therewith: Plaintiff's Statements of Material Facts Not in Dispute on Motion for Summary Judgment, undated; the So Defendants' Statement of Facts Not in Dispute, undated; the Richemont Defendants' Statement of Facts Not in Dispute, dated August 11, 2008. Except where necessary, no further citation to these documents will be made.

The Court notes that RFMAS failed to file its Statement of Material Facts ("SMF") with its Motion for Summary Judgment. The error was called to RFMAS's attention, and RFMAS filed its SMF a few days after filing its motion. The Court also notes that none of the exhibits filed by RFMAS in support of its Motion for Summary Judgment were authen-

ticated by a declaration or affidavit until the Declaration of Steven Crosby was filed. However, the Court accepts RFMAS' filings and exhibits, as it finds that Defendants were not prejudiced by these errors. The Court will cite to all of RFMAS's exhibits as "RFMAS Ex. ___."

**3.** Scognamiglio's name is interchangeably referred to in the motion papers as "Scognamiglio" and "Scongnamiglio." For the purpose of consistency, the Court will refer to him as "Scognamiglio." Similarly, Mennella's name is interchangeably referred to as "Mennella," "Mannella," and "Mennela." The Court will refer to him as "Mennella" unless directly quoting another usage.

## B. *RHI'S ACQUISITION OF MSI*

On or about December 31, 2003, RHI acquired a 40% interest in MSI's stock in exchange for $6 million. As part of the acquisition, RHI had the power to designate two of the initial directors of MSI's five-person board. Edwin McQuigg ("McQuigg"), a Richemont executive, and Christopher Colfer ("Colfer"), Director of Richemont Int'l, were chosen to fill these positions. Colfer was later replaced on MSI's board by Daniel Mawicke ("Mawicke"), President and Chief Executive Officer of Richemont NA.

The parties dispute the level of oversight and input provided by RHI into MSI's day-to-day business. RFMAS argues that RHI exercised control over MSI's day-to-day operations, including supervision of jewelry designs. The Richemont Defendants, however, argue that RHI "had no input into how MSI was run on a day-to-day basis. Rather, this was merely a financial investment made for the purpose of providing capital to an up-and-coming jewelry company." (Richemont Defendants' Memorandum of Law in Support of Summary Judgment, dated August 11, 2008 ("Richemont Mem."), at 5.)

Richemont NA extended MSI $4.5 million through a series of loans in 2005 and 2006. RFMAS argues that these loans gave the Richemont Defendants additional control over MSI.

The partnership between RHI and MSI terminated in 2007, and no Richemont company currently holds any investment in MSI.

## C. *RICHEMONT'S POSSIBLE ACQUISITION OF RFMAS*

In June 2004, McQuigg met with RFMAS's principals, Mennella and Scognamiglio, at RMFAS's New York showroom to discuss Richemont's possible investment in RFMAS. Though the parties dispute whether the Stella Pieces at issue in this litigation were in the showroom, McQuigg concedes that he was shown "press clippings and jewelry." (Declaration of Edwin McQuigg, dated July 29, 2008 ("McQuigg Decl.") ¶ 6.) McQuigg later introduced RFMAS's principals to So and her husband.

As part of Richemont's investigation into whether RFMAS was a viable acquisition, McQuigg brought Colfer, who had the authority to approve investments, to RFMAS's showroom to meet its principals. In October 2004, Colfer and Scognamiglio discussed and entered into a non-disclosure agreement. RFMAS worked with Bob Angus ("Angus"), an intern from Columbia Business School who worked with McQuigg, to prepare a thorough business plan and financials for Richemont's evaluation. While the parties dispute the information provided to Angus, the parties agree that, at minimum, RFMAS provided Angus with financial data and projections for growth.

After receiving the business plan from Angus, Colfer informed McQuigg that RFMAS was too small for any of the various Richemont companies to invest in. Colfer and McQuigg informed RFMAS of its decision to not invest in RFMAS in early December 2004, and indicated that they might reconsider possible investment if RFMAS grew. RFMAS contends that talks about a possible investment continued over two years during which its principals met with Richemont executives over twenty times.

## D. *CREATION OF THE GATE B9 JEWELRY LINE*

In 2006, MSI made available for sale to the public its "Gate B9" line of jewelry. This Gate B9 collection includes necklaces and earrings that RFMAS claims infringe

upon the copyright and trade dress of selected Stella necklaces and earrings.

A central dispute in this case involves the creation of the Gate B9 jewelry line. The So Defendants claim that So created the Gate B9 designs in September of 2005 while in an airport in Europe (giving rise to the name of the product line), and that she did not copy her designs from RFMAS's Stella designs but, rather, independently created her own designs. RFMAS, however, argues that Defendants accessed the Stella designs when So and McQuigg visited RFMAS's showroom in 2004, and that the similarities between the Stella Pieces and the Gate B9 pieces are so substantial as to warrant a finding of copyright infringement as a matter of law, and are likely to confuse members of the public such that they would mistakenly attribute the Gate B9 pieces to RFMAS.

### E. *RFMAS'S SUPPLEMENTARY REGISTRATION*

Scognamiglio was deposed in connection with this case in January of 2008, and during this deposition, he was presented with a copy of the Registration. He was again deposed in February of 2008. Mennella was also deposed during this time period. Fact discovery closed on March 14, 2008.

On June 26, 2008, RFMAS filed a supplementary registration with the Copyright Office, purporting to correct seven misstatements contained in the Registration, which are discussed in further detail below. This supplementary registration was assigned Copyright Registration No. VA 1–429–069 (the "Supplementary Registration"). (*See* RFMAS Ex. 63.)

### II. *DISCUSSION*

### A. *LEGAL STANDARD*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is ap-

propriate when the evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The moving party bears the burden of proving that no genuine issue of material fact exists, or that because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (*quoting* Fed. R.Civ.P. 56(c))).

When deciding cross-motions for summary judgment, the standard to be applied "is the same as that for individual summary judgment motions and a court must consider each motion independent of the other." *Schultz v. Stoner,* 308 F.Supp.2d

289, 298 (S.D.N.Y.2004) (internal quotation marks and citation omitted).

## B. *SPOLIATION*

As discussed in the March 30 Order, it is inappropriate at this time for the Court to consider the spoliation issues RFMAS raises in its motions for summary judgment. These pre-trial discovery matters were referred to Magistrate Judge Michael Dolinger, who has not made a finding of spoliation. Therefore, the Court will not impose the sanctions for the alleged spoliation that RFMAS requests in its motions, nor rely upon any inferences or presumptions stemming from allegations of spoliation.

## C. *RFMAS'S OWNERSHIP OF A VALID COPYRIGHT*

■ To succeed on the merits of its copyright infringement claim, RFMAS must show: "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/ Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

■ Under 17 U.S.C. § 411(a), "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." Accordingly, barring some applicable exception, the absence of a valid copyright registration divests the Court of subject matter jurisdiction over an action for copyright infringement. *See Morris v. Business Concepts, Inc.,* 259 F.3d 65, 68 (2d Cir.2001);

*Eyal R.D. Corp. v. Jewelex New York, Ltd.,* 576 F.Supp.2d 626, 633 (S.D.N.Y. 2008). Thus, if the Registration is not valid, the Court must dismiss RFMAS's copyright claims for want of jurisdiction.

RFMAS argues that, as a matter of law, its copyright is valid because (1) the registered work has the requisite originality; (2) the Registration constitutes prima facie evidence of the copyright's presumptive validity, which the So Defendants do not sufficiently rebut; and (3) in the alternative, RFMAS's first publication of the Stella designs in Italy guarantees protection under U.S. copyright law pursuant to the Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"), to which both Italy and the United States are signatories. The So Defendants counter that (1) RFMAS cannot avail itself of the statutory presumption of the Registration's validity; (2) the Registration is invalid because a group of unrelated items may not be registered in a single registration; and (3) absent evidence of first publication in Italy, the Court does not have jurisdiction to hear RFMAS's copyright claims.[4]

### 1. *Originality*

■ "To qualify for copyright protection, a work must be original to the author." *Feist,* 499 U.S. at 345, 111 S.Ct. 1282. The requisite level of originality is extremely low—"even a slight amount will suffice." *Id.* Even if the elements used in the work are not protectible standing alone, protection extends to the selection and arrangement of those unprotected elements in the final work, as long as the author's selection and arrangement are

---

**4.** RFMAS raises nearly identical validity arguments against the Richemont Defendants. The Richemont Defendants do not offer independent arguments regarding the validity of the Registration, and instead join those of-

fered by the So Defendants. (*See* Richemont Defendants' Opposition to RFMAS's Memorandum of Law in Support of Summary Judgment, dated September 19, 2008, at 11 n. 4.)

original. *See id.* at 348, 111 S.Ct. 1282 ("[E]ven a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement."); *Yurman Studio, Inc. v. Castaneda,* 591 F.Supp.2d 471, 494 (S.D.N.Y.2008).

The So Defendants do not dispute that the Stella Pieces are sufficiently original to survive cancellation of the Registration. The Court thus finds that for the purpose of determining whether RFMAS has a valid copyright in the Stella Pieces, the work is sufficiently original.

### 2. *Presumption of Validity of the Copyright and Facts Stated in the Certificate*

■ Under 17 U.S.C § 410(c) ("Section 410(c)"), a "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." Possession of a certificate of registration provides its holder with a rebuttable presumption of ownership of a valid copyright. *See Boisson v. Banian, Ltd.,* 273 F.3d 262, 267 (2d Cir.2001); *Fonar Corp. v. Domenick,* 105 F.3d 99, 104 (2d Cir.1997). It also creates a rebuttable presumption that all facts stated in the certificate are true. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 111 (2d Cir.1998). At that point, "[t]he party challenging the validity of the copyright has the burden to prove the contrary." *Hamil America Inc. v. GFI,* 193 F.3d 92, 98 (2d Cir.1999); *see also Castaneda,* 591 F.Supp.2d at 484 ("A plaintiff's 'proffer of its certificate of copyright registration thus shifts to the defendant the burden of proving the invalidity of the copyright and there the burden rests, unless the presumptions are rebutted.' " (*quoting Fonar,* 105 F.3d at 104) (alterations omitted)). "[T]he presumption of validity may be rebutted where other evidence in the record casts doubt on the question." *Fonar,* 105 F.3d at 104 (quotation marks and emphasis omitted).

It is undisputed that RFMAS has a certificate of registration for the nine Stella Pieces at issue in the form of the Registration. In addition, regardless of whether first publication of the Stella Pieces occurred in 2001 or 2002 (an issue which the parties dispute), the certificate, dated April 28, 2004, was made within five years of first publication.[5] Thus, the Registration constitutes prima facie evidence that RFMAS's copyright is valid, entitling RFMAS to a rebuttable presumption of its validity.

The presumption of validity as to the statements contained in the certificate, however, is another matter. RFMAS filed the Complaint in this case on November 11, 2006, and the Amended Complaint on May 9, 2007. On January 10, 2008, Scognamiglio was deposed in connection with

---

**5.** The Court rejects the So Defendants' argument that because RFMAS modified the certificate in 2008 via the Supplementary Registration, the Registration was not made within five years of first publication. (*See* So Defendants' Reply Memorandum of Law in Support of Summary Judgment, dated October 10, 2008 ("So Reply"), at 5.) Under 17 U.S.C. § 408(d), "[t]he information contained in a supplementary registration augments but does not supersede that contained in the earlier registration"; *see also Gener–Villar v. Adcom Group, Inc.,* 560 F.Supp.2d 112, 127 (D.P.R.2008) (holding that while the author filed a supplementary registration more than five years after creation of the work, "those corrections do not affect the earlier date of plaintiff's initial registration"). The date the Supplementary Registration was made has no bearing on the timeliness of the Registration under Section 410(c).

this case.[6] At that deposition, Scognamiglio provided testimony as to dates and locations of the creation and publication of the Stella Pieces. For example, Scognamiglio stated that the first sale of the relevant Stella jewelry took place in the spring of 2002, and that the first purchase order was received at the "end of January 2002." (Scognamiglio Dep. at 46.) He further stated that the pieces were never sold abroad before being sold in the United States in 2002. (*See id.* at 122.) Scognamiglio was presented with a copy of the Registration at that deposition, which corroborated that testimony. (*See id.* at 121; Prescott Aug. Decl. Ex. 2.) Later that day, Scognamiglio provided testimony inconsistent with his earlier testimony, stating that the "whole collection" was first sold in Italy in 2001 "to a company to distribute it in Italy." (Scognamiglio Dep. at 141.) On February 5, 2008, Scognamiglio testified that the works in the Stella collection were first sold to his parents' distribution company in Italy in 2001. (*Id.* at 325–27.) Fact discovery here closed on March 14, 2008.

On June 26, 2008, more than three months after fact discovery closed, and more than five months after he provided testimony in his deposition that was inconsistent with the information contained in the Registration, RFMAS filed the Supplementary Registration, amending the following:

(1) The response to "Name of Author" (Section 2a) was changed from "R.F.M.A.S., Inc. d/b/a Faraone Mannella" to "Amedeo Scognamiglio and Roberto Faraone Mennela";

(2) The response to "Was this contribution to the work a 'work made for hire'?" (Section 2a) was changed from "yes" to "no";

(3) The response to "Author's Nationality or Domicile" (Section 2a) was changed from "USA" to "Italy";

(4) The response to "Year in Which Creation of This Work Was Completed" (Section 3a) was changed from 2002 to 2001;

(5) The response to "Nation of Publication of This Particular Work" (Section 3b) was changed from providing no response to "Italy";

(6) The response to "Date of First Publication of This Particular Work" (Section 3b) was changed from "May 1, 2002" to "October 1, 2001," and was amended again on July 8, 2008 by fax request to "May 1, 2001"; and

(7) The response to "Transfer" (Section 4) was changed from providing no response to "Transfer is By Assignment."

Even with these modifications, RFMAS is entitled to a prima facie presumption of the copyright's validity, as corrections to a certificate of registration do not affect the presumptive validity of a copyright. *See, e.g., Hamil,* 193 F.3d at 98–99 (finding that the filing of a supplementary registration to correct technical deficiencies in a certificate do not affect a copyright's validity unless accompanied by fraud). Even if RFMAS had willfully misstated a fact in the Application—and the Court need not and does not now make such a determination—the Court may invalidate the Registration only if the Copyright Office's

---

6. The parties provide many excerpts of Scognamiglio's depositions, which took place on January 10, 2008 and February 5, 2008. These excerpts can be found at the following locations: Declarations of John P. Margiotta, dated August 11, 2008 and September 19, 2008 ("Margiotta Decl."), Exs. 33, 57, 58; Prescott Aug. Decl. Ex. 27; Declaration of Christopher B. Prescott, dated September 19, 2008, Ex. 1; RFMAS Exs. 5, 65, 102. For ease of reference, the Court will collectively cite to these exhibits as "Scognamiglio Dep."

knowledge of the truth would have caused it to reject RFMAS's application. *See Eckes v. Card Prices Update*, 736 F.2d 859, 861–62 (2d Cir.1984) ("Only the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitutes reason for holding the registration invalid . . . ." (quotation marks and alterations omitted)). With one exception, the So Defendants point to no evidence of alleged misstatements by RFMAS that, if known, would have caused the Copyright Office to reject RFMAS's application.[7] The copyright is therefore presumptively valid, and the burden shifts to the So Defendants to rebut that presumption of validity.

However, RFMAS is not entitled to a presumption of the accuracy of the statements contained in the Supplementary Registration. RFMAS filed the Supplementary Registration over a year and a half after initiating this action, and more than five months after having been made aware of inconsistencies between the Registration and Scognamiglio's testimony during his January 2008 deposition. Indeed, the Supplementary Registration was filed more than three months after the close of fact discovery and just over one month before the deadline for filing summary judgment briefs. Hence, this is not a matter of immediately correcting an innocent mistake; RFMAS was aware of the supposedly inaccurate information contained in the Registration, yet failed to submit corrections until the last minute. By waiting until after the close of fact discovery to correct the Registration, despite being aware its supposed inaccuracies for several months, RFMAS forfeited any presumption as to the accuracy of the statements contained in the Supplementary Registration.

Such an outcome is consistent with Section 410(c)'s underlying purpose. Section 410(c) offers a presumption of the accuracy of statements contained in a certificate because "[t]he plaintiff should not ordinarily be forced in the first instance to prove all of the multitude of facts that underline [sic] the validity of the copyright unless the defendant, by effectively challenging them, shifts the burden of doing so to the plaintiff." Notes of Committee on the Judiciary, H.R.Rep. No. 94–1476 ("Committee Notes"). This language evinces Congress's intent to generally afford a plaintiff with the tools to establish a presumption of a copyright's *validity*. However, there is little reason for a court to award a presumption of accuracy to statements in a supplementary registration that do not endanger the presumption that the copyright is valid. In this case, as discussed further below, the Court has determined that the copyright was presumptively valid as originally filed. Therefore, RFMAS need not rely upon the accuracy of the statements contained in the Supplementary Registration to sustain the presumption of the validity of the certificate.

Accepting the statements contained in the Supplementary Registration as presumptively accurate, however, could prejudice the So Defendants. RFMAS asks that a plaintiff, months after the close of fact discovery, be free to neutralize potentially unfavorable deposition testimony simply by filing a supplementary registration and declaring that the new and contradictory statements contained therein are presumptively true. To some extent, such an outcome is an unavoidable compo-

---

7. The So Defendants' argument that the certificate is invalid because a group of unrelated items may not be registered in a single application is an attempt to rebut the presumption of validity. The Court addresses this argument below.

nent of Section 410(c).[8] By not filing the Supplementary Registration until after the close of fact discovery, however, RFMAS deprived the So Defendants of the ability to conduct discovery related to the Supplementary Registration (and there is no indication that RFMAS voluntarily provided discovery or disclosed this filing to the So Defendants in order to afford them an opportunity to reopen discovery for that limited purpose). Under these specific circumstances, to award RFMAS with a presumption as to the accuracy of the statements in the Supplementary Registration—that first publication of the Stella Pieces occurred in Italy in 2001, for example—would be inequitable and inconsistent with the purpose and spirit of the presumption.

The Court does not at this point make a finding that RFMAS acted in bad faith by failing to file the Supplementary Registration until after the close of discovery. Nevertheless, RFMAS should not benefit from a presumption as to a statement's validity when RFMAS was put on notice of the supposedly flawed contents contained in the original certificate during a deposition, but failed to correct the statements until many months later, after fact discovery closed. To permit such a presumption to stand would open an unacceptable loop-

hole in Section 410(c), whereby a plaintiff could defuse unfavorable deposition testimony by "correcting" a registration on the eve of trial and nonetheless be rewarded with a presumption as to the statement's validity.[9]

Finally, depriving RFMAS of the presumption of the accuracy of the amended submissions does not affect the presumptive validity of the copyright. The Supplementary Registration affects whether RFMAS should receive an evidentiary presumption that: (1) the authors of the work are Scognamiglio and Mennella; (2) the work was not made for hire; (3) the authors' nationality or domicile is Italy; (4) the work was created in 2001; (5) the nation of publication was Italy; (6) the first publication occurred on May 1, 2001; and (7) the work was transferred by assignment. Even without deeming these statements to be presumptively valid, the Court has determined that the copyright is presumptively valid. In other words, the statements contained in the Supplementary Registration do not cure an otherwise invalid certificate. This finding distinguishes the instant case from others addressing Section 410(c), where the amended statements cure a registration that otherwise would be defective. *See,*

---

**8.** A leading treatise warns of the risk involved in accepting the statements presented in a certificate as presumptively valid, stating that "[p]art of the problem here arises in that a party who is willing to play fast and loose with the truth may pretty much guarantee that it enters the courthouse armed with a certificate bearing, on its face, a *prima facie* presumption of validity." 3 *Nimmer on Copyright* § 12.11[A][3] at 12–199.

**9.** The Court finds the analysis in *Xoom, Inc. v. Imageline, Inc.,* 323 F.3d 279 (4th Cir.2003), to be instructive. There, the plaintiff asserted the "innocent error rule" as protection from errors in its copyright certificate. The Fourth Circuit held that failure to make corrections were per se intentional when the plaintiff was

on notice of an error and failed to act. *See id.* at 283 n. 4. The plaintiff in *Xoom* did not correct an erroneous certificate after being notified of the error by the Copyright Office, whereas RFMAS was put on notice by Defendants and did eventually correct the certificate. However, the Court recognizes the general principle that when a registrant is made aware of errors in a certificate, the registrant can only wait for so long before "failure to make the necessary corrections to its application for copyright registration cannot be considered innocent." *Id.* At a minimum, such a registrant should not be rewarded with a presumption of the accuracy of the eleventh-hour "corrections."

*e.g., eScholar, LLC v. Otis Educ. Sys., Inc.,* No. 04 Civ. 4051, 2005 WL 2977569, at *13 (S.D.N.Y. Nov. 3, 2005) (holding that the "innocent error rule" applies because the Copyright Office "clearly would have accepted" the application if it contained the proper information).

When facing unusual circumstances, courts have exercised caution before awarding statements provided in a supplementary registration with presumptive validity. In *NBC Subsidiary (KCNC–TV), Inc. v. Broadcast Info. Servs., Inc.,* 717 F.Supp. 1449 (D.Colo.1988), for example, the parties disputed whether a work had been published. The certificate of registration did not contain a date of first publication, but after the close of discovery, the plaintiff attempted to file a supplementary registration providing that date for the first time. The court stated even if the Copyright Office accepted the supplementary registration, the filing would not cancel the earlier registration, but rather bring to the public's attention a possible error or omission. *See id.* at 1451. The court concluded that "the prima facie effect of the registration as it relates to the issue of publication will be neutralized because it will contain conflicting statements of facts." *Id.; see also William A. Graham Co. v. Haughey,* 430 F.Supp.2d 458, 467–68 (E.D.Pa.2006) (holding that a finding of bad faith may not be premised on a mere inconsistency between earlier and supplementary registrations but also holding that a registrant "cannot rely on any presumption emanating from" supplementary registrations correcting mistakes of an initial registration, without satisfactorily explaining the inconsistencies (*citing Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806–07, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999))).

The instant case poses unusual circumstances that were likely not considered by the drafters of Section 410(c). Indeed, the Committee Notes state that a plaintiff "should not *ordinarily* be forced in the first instance to prove all of the multitude of facts" (emphasis added), suggesting that extraordinary circumstances may warrant a denial of the presumption if such a result would serve the principles of equity. In the unique circumstances present in this case, it would be inequitable to provide RFMAS with a presumption that its modified statements are valid. While the Copyright Office has a procedure for correcting innocent and inadvertent misstatements, and while courts generally refrain from invalidating certificates based on such misstatements, courts also have a duty to ensure that such revisions are made fairly and in a way that will not prejudice defendants. Here, such a prejudice may have occurred—the So Defendants indicate they were not aware of the Supplementary Registration until they received RFMAS's summary judgment brief, and RFMAS had ample time to provide corrections to the Copyright Office prior to the close of fact discovery but failed to do so.

The Court therefore concludes that while RFMAS is entitled to a rebuttable presumption of the copyright's validity, it is not entitled to a presumption of the validity of the statements contained in the Supplementary Registration. The So Defendants' motion for summary judgment on this issue is granted only as it challenges the presumptive validity of the statements contained in the Supplementary Registration, and RFMAS's corresponding motion for summary judgment as to this issue is denied.

In denying RFMAS the presumption of validity as to the statements contained in the Supplementary Registration, the Court makes no determination regarding the credibility of those statements. "Assess-

ments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *see also Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 174 (2d Cir.2006) ("[C]redibility, in the ordinary course of things, is for a fact-finder to evaluate."). If the factfinder should determine that the Registration contains errors, the Court will decide at that time whether such inaccuracies render the copyright invalid.

As to the factual disputes regarding whether (1) the authors are Scognamiglio and Mennella or RFMAS; (2) the work was or was not "made for hire"; (3) the authors' nationality or domicile is Italy or the United States; and (4) the work was or was not transferred by assignment, such determinations will not likely have any impact on the copyright's validity. To the extent that the Registration may contain errors on these four issues, the Court cannot cancel the Registration unless the So Defendants point to evidence that, if known, would have led the Copyright Office to reject the Registration. The parties offer two suppositions regarding these statements: (1) the version contained in the Registration, where RFMAS is the author and the work is a "work for hire"; or (2) the version contained in the Supplementary Registration, where Mennella and Scognamiglio are the authors, and the work was not a "work for hire," but rather was transferred by assignment to RFMAS. Even if the factfinder ultimately concludes that the Registration does not reflect the proper authors and ownership, the So Defendants present no prospect, supported by evidence, that would have led the Copyright Office to reject the Application, and courts routinely reject challenges to registrations based on such technicalities that are easily corrected. *See, e.g., eScholar,* 2005 WL 2977569, at *13 (finding that the

errors at issue "would not have led to the rejection of the application if they were discovered" and thus the "copyright is not invalid as a matter of law even if it did not comply with the technical requirements"); *Huthwaite, Inc. v. Sunrise Assisted Living, Inc.,* 261 F.Supp.2d 502, 510–11 (E.D.Va.2003) (holding that a "technical error," without any evidence that it is "anything other than inadvertent and immaterial, without effect on the validity of the registration," is not the type that renders "a registration invalid for the purpose of § 411(a)"). Therefore, while it is for the factfinder to determine the proper author of the work and whether the work was a work for hire or was transferred by assignment to RFMAS, how the factfinder resolves these factual disputes will not likely have a meaningful effect on the outcome of this action.

The same cannot be said, however, for the factual disputes regarding whether (1) the work was created in 2001 or 2002; (2) the nation of first publication was the United States or Italy; and (3) the first publication occurred in May of 2001 or May of 2002. Although resolution of these three issues will have no bearing on whether the copyright is valid (the copyright would be valid, whether first published in the United States in 2002 or in Italy in 2001), it does have potential consequences for determining whether RFMAS may alternatively seek copyright protection pursuant to the Berne Convention. In particular, *if* the So Defendants successfully rebut RFMAS's presumption of the copyright's validity and *if* the work was first published in Italy in 2001, then RFMAS arguably could secure copyright protection for the Stella Pieces under the Berne Convention. *See* 17 U.S.C. § 104(b)(2). The Court addresses this issue more fully below.

### 3. *Registration of a Jewelry Collection in a Single Application*

■ In an attempt to rebut the presumption of the copyright's validity, the So Defendants argue that the Registration is invalid because it does not meet the requirements of the Copyright Act. Specifically, the So Defendants contend that the Registration contains approximately eighty "largely unrelated items," and that "[s]uch a group of unrelated items may not be registered as a single registration." (So Defendants' Memorandum of Law in Support of Summary Judgment, dated August 11, 2008 ("So Mem."), at 5.)

The Copyright Act allows multiple items to be registered in a single application as either (1) a group registration or (2) a single work registration. The distinction between the two is critical, as the requirements for a group registration are different from those for a single work registration.

The Court finds that the Registration cannot be valid as a group registration of jewelry designs. Under 17 U.S.C. § 408(c)(1), "[t]he Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration. The regulations may require or permit ... a single registration for a group of related works." Under this authority, the Register of Copyrights has issued regulations permitting group registration for "automated databases," "related serials," "daily newspapers," "contributions to periodicals," "daily newsletters," and "published photographs." 37 C.F.R. § 202.3(b)(5)-(10). However, the Register of Copyrights has not issued regulations explicitly permitting group registration of jewelry designs or sculptural works, rendering such works incompatible with group registration. *See Castaneda,* 591 F.Supp.2d at 492 & n. 115 (recognizing that "neither sculptural works nor jewelry designs are included in the group registration regulations" and concluding that jewelry collections "properly fall under the category of single work registrations rather than group registrations"); *see also Kay Berry, Inc. v. Taylor Gifts, Inc.,* 421 F.3d 199, 204 (3d Cir.2005) ("Since the Register of Copyrights has not promulgated regulations allowing for group registration of sculptural works, we conclude that Kay Berry's registration is not valid under the current group registration provisions."). Therefore, the Registration is not valid as a group registration of jewelry designs.

However, the Registration might be valid as a single work registration of RFMAS's jewelry designs. The relevant regulation here is 37 C.F.R. § 202.3(b)(4)(i)(A) ("Section 202.3(b)(4)"), which states that "all copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same" shall be considered a single work and thus may be filed for registration on a single application. The So Defendants contend, however, that because many of the approximately eighty items pictured in the deposit accompanying the Registration "are completely unrelated to each other," RFMAS has not provided any "evidence that demonstrates the existence of a 'single unit of publication' containing all of the items in the deposit," and the Registration is therefore invalid as a single work registration. (So Mem. at 5.)

Jewelry collections are eligible to be registered in a single work registration. This issue was recently discussed in *Castaneda,* where the defendants sought to invalidate the plaintiff's registration for a jewelry collection on the same grounds as

those offered by the So Defendants. There the court held:

> [J]ewelry collections properly fall under the category of single work registrations rather than group registrations.... [A] single work registration for a published work covers "all copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same." In this case, a collection of jewelry—usually a set of pieces thematically related and released for sale at the same time—can be deemed a single unit of publication.

591 F.Supp.2d at 492 (footnotes omitted). While *Castaneda* states that a collection of jewelry is "*usually* a set of pieces thematically related and released for sale at the same time," *id.* (emphasis added), there is no requirement that the pieces *must* be thematically related. Rather, Section 202.3(b)(4) requires only that: (1) all copyrightable elements must be otherwise recognizable as self-contained works; (2) the items must be included in a single unit of publication; and (3) the copyright claimant must be the same. *See Kay Berry*, 421 F.3d at 205 ("The single work registration regulation is silent on whether the individual, self-contained elements of the 'single work' be 'related' in order to be registered. Instead, single work registration requires, in the case of published works, that all of the self-contained works be 'included in a single unit of publication' and share the same copyright claimant.").[10] The So Defendants do not challenge the first and third requirements, limiting their challenge to whether the items in the deposit

were originally included in a "single unit of publication."

The Court has already found that RFMAS is entitled to a presumption of the copyright's validity; this presumption includes the preliminary determination by the Copyright Office that the Stella collection was included in a single unit of publication. *See Fonar*, 105 F.3d at 106 ("[W]e think that a presumption of regularity and appropriateness in filing is ordinarily subsumed in the presumption of validity that attaches to a certificate of copyright registration."); *Gross v. NYP Holdings, Inc.*, No. 06 Civ. 7863, 2007 WL 1040033, at *4 (S.D.N.Y. April 4, 2007) (citing *Fonar* in refusing to find that photographs were improperly registered as a single work).

RFMAS also points to a letter sent by Joanna Corwin, an Examiner in the Visual Arts Section of the Copyright Office, dated August 27, 2004. (*See* Prescott Aug. Decl. Ex. 6 (the "Corwin Letter").) The Corwin Letter informed RFMAS that "[t]his is a collection of individual works which were apparently published as a single unit. Registration has been made because at least one work in the collection would support an independent claim to copyright. Several, however, if considered separately, would not support an independent claim and would not be protected by copyright." (*Id.*) While the Corwin Letter's language that "[t]his is a collection of individual works which were apparently published as a single unit" may constitute form language, the *Castaneda* Court cited to an examiner's letter containing identical language in denying the defendants' request to invalidate a copyright. *See* 591 F.Supp.2d at 492 & n. 118. The Court

---

10. The So Defendants' insistence that *Kay Berry* stands for the proposition that the items in a single unit of publication must be "related" is puzzling, as the *Kay Berry* came to the opposite conclusion. *See* 421 F.3d at 206 ("Kay Berry's garden accent rocks may not be

sufficiently 'related' but they were included in a single unit of publication and the copyright claimant is the same so, regardless of their relatedness, they may be registered pursuant to the single work registration regulation.").

likewise holds that RFMAS is entitled to a presumption that the pieces in the fifty-four photographs depicted in the deposit were first published as a single unit. Consequently, the So Defendants' motion for summary judgment on this issue is denied.

However, such a presumption is rebuttable, and the So Defendants argue that evidence in the record indicates that the items in the Registration were not first published as a single unit. While the Court is not aware of, nor do the parties direct the Court to, any case that provides a definition of the term "single unit of publication," the Copyright Act provides defines "publication" as

> the distribution of copies ... of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies ... to a group of persons for purposes of further distribution ... or public display, constitutes publication. A ... display of a work does not of itself constitute publication.

17 U.S.C. § 101. The distribution of catalogs and collections of photographs to multiple parties has been found by other courts to constitute a single unit of publication. *See, e.g., Kay Berry,* 421 F.3d at 203, 206; *Gross,* 2007 WL 1040033, at *4. RFMAS did not first distribute the items in the deposit in a catalog or brochure; rather, Scognamiglio testified in his deposition that the items were shipped to his parents' store. (Scognamiglio Dep. at 150.) Scognamiglio further stated that his parents were the "exclusive distributors for the Italian market," and the items were not offered or sold "to the public" or to any other companies or persons, though his parents' store did make some sales. (*Id.*) Aside from the testimony of RFMAS's principals, RFMAS has not adduced any evidence of such a transaction with Scognamiglio's parents. Finally, a factual dispute exists as to the nature of the first publication (that is, whether the items were first published in the United States in 2002, or in Italy in 2001), based upon both Scognamiglio's inconsistent testimony and the facts contained in the original Registration. *See Home Design Servs., Inc. v. B & B Custom Homes, LLC,* No. 06–cv–00249, 2007 WL 3342695, at *1 (D.Colo. Nov.8, 2007) (finding existence of genuine issue of material fact as to publication date for purpose of determining existence of valid registration).

The So Defendants have sufficiently raised issues of material fact, based upon "other evidence in the record," *Fonar,* 105 F.3d at 104, as to whether the items in the Registration were first included in a single unit of publication. Indeed, resolution of this issue depends largely on the credibility of RFMAS's principals, and "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule,* 85 F.3d at 1011. The So Defendants therefore may attempt to rebut at trial the presumption of validity afforded to RFMAS as to whether the Registration is valid as a single work registration. Accordingly, RFMAS's motion for summary judgment on this issue is denied.

### 4. *First Publication in Italy*

■ RFMAS next argues that whether or not the Registration is valid, the Stella Pieces are nonetheless protected under U.S. copyright law. Specifically, RFMAS asserts that because it first published its Stella designs in Italy in 2001, the Stella Pieces are protected by U.S. copyright law pursuant to the Berne Convention, to which both Italy and the United States are signatories.

Under 17 U.S.C. § 104(b)(2), a copyright is protectable under U.S. law if "the work

is first published in ... a foreign nation that, on the first day of publication, is a treaty party." There is no dispute that in 2001, both the United States and Italy were signatories to the Berne Convention. *See* United States Copyright Office, Circular 38a, International Copyright Relations of the United States, *available at* http://www.copyright.gov/circs/circ38a.pdf.

RFMAS asserts that its principals created the Stella Pieces in Italy in 2001 and that the pieces were first published in Italy in 2001, while the So Defendants argue that other evidence in the record suggests that the Stella Pieces were first published in the United States in 2002. As discussed above, RFMAS's assertion that the Stella designs were created and published in Italy in 2001 relies heavily (indeed, almost exclusively) on the testimony of RFMAS's principals. In addition, the Court has already determined that RFMAS is not entitled to a presumption of validity as to the revised creation and first publication locations and dates. Resolution of this issue presents a genuine dispute of material fact that largely rests upon an assessment of credibility, and again, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule*, 85 F.3d at 1011. Therefore, RFMAS's motion for summary judgment on this issue is denied.

## D. *UNAUTHORIZED COPYING OF THE STELLA PIECES*

Even if RFMAS succeeds in establishing that it owns a valid copyright in the Stella Pieces, RFMAS cannot succeed on the merits of its claim of copyright infringement unless it also establishes that the Defendants engaged in "unauthorized copying" of that work. *Jorgensen*, 351 F.3d at 51. To do so, "the copyright owner must demonstrate that (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir.2001) (quotation marks omitted).

"Because copiers are rarely caught red-handed, copying has traditionally been proven circumstantially by proof of access and substantial similarity." *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir.1988); *see also City Merch., Inc. v. Broadway Gifts Inc.*, No. 08 Civ. 9075, 2009 WL 195941, at *1 (S.D.N.Y. Jan.27, 2009). RFMAS now seeks a determination by the Court that (1) Defendants accessed the Stella Pieces; and (2) the Gate B9 pieces are substantially similar to the protectible elements of the Stella Pieces. The So Defendants seek a determination by the Court that the Gate B9 pieces are not substantially similar to the protectible elements of the Stella Pieces. The Richemont Defendants seek a determination by the Court that (1) they are not liable for direct infringement because RFMAS has not adduced any evidence that the Richemont Defendants composed the Gate B9 pieces; and (2) they are not liable for indirect infringement. The Court addresses each argument in turn.

### 1. *Access*

■ RFMAS first argues that, as a matter of law, Defendants accessed the Stella Pieces. According to RFMAS, it need prove only that Defendants had a reasonable opportunity to see the work, and such access by Defendants is established "through innumerable meetings, viewings, and wide distribution (in the same store as Defendants' jewelry and in magazines) before [the] alleged design of Defendants' line." (RFMAS's Memorandum of Law in

Support of Summary Judgment Against the So Defendants, filed August 11, 2008 ("RFMAS/So Mem."), at 6.) RFMAS further argues that the So Defendants admitted to seeing the designs in RFMAS's showroom and in Neiman Marcus before designing the Gate B9 jewelry in 2005.

The So Defendants counter that RFMAS has not sufficiently described what is meant by the term "Stella collection," and that RFMAS thus has not introduced sufficient evidence that the nine pieces at issue were accessed by the So Defendants. The So Defendants conclude that "there is no evidence that Mimi So or any other MSI or Richemont representative saw these particular items when visiting Plaintiff's offices," and that there is thus an issue of fact as to access. (So Defendants' Opposition to RFMAS's Memorandum of Law in Support of Summary Judgment, dated September 19, 2008, at 6.)

"Access may be inferred when a defendant had a reasonable opportunity to view the plaintiff's work before creating its own." *Eyal R.D.*, 576 F.Supp.2d at 642 (*citing Gaste*, 863 F.2d at 1066–67). "Access means that an alleged infringer had a 'reasonable possibility'—not simply a 'bare possibility'—of [viewing] the prior work; access cannot be based on mere 'speculation or conjecture.'" *Jorgensen*, 351 F.3d at 51 (*citing Gaste*, 863 F.2d at 1066). Further, just any evidence of access will not do—"[i]n order to support a claim of access, a plaintiff must offer significant, affirmative and probative evidence." *Id.* (quotation marks omitted).

The Court faces particular difficulty in resolving this issue on the record before it because RFMAS' allegation in this regard is only that the "Stella collection" was accessed, and that term may or may not include the nine registered Stella Pieces. While RFMAS repeatedly states that it has received a copyright registration for nine Stella Pieces (*see, e.g.,* RFMAS/So Mem. at 3–4), no submission from RFMAS establishes that these nine specific pieces were accessed by Defendants.

RFMAS argues that the Complaint, the supplemental interrogatory responses, and Scognamiglio's deposition testimony provide Defendants with sufficient notice of which designs were allegedly accessed; however, RFMAS directs the Court only to the "prime pieces" at issue. (*See* RFMAS's Reply in Support of Summary Judgment Against the So Defendants, dated October 10, 2008, at 2 n. 1.) The Court hesitates to deem the Stella Pieces as having been accessed when RFMAS has not clearly indicated the evidence supporting access for each of the particular nine registered works, instead referring to access of either RFMAS jewelry in general, or of the "Stella collection" as a whole.

RFMAS argues that it does not need to specify the accessed pieces because all of its designs were displayed in its showroom, but such self-serving testimony, without more, is not the sort of "significant, affirmative and probative evidence" that entitles to RFMAS to a finding of access as a matter of law.[11] *Jorgensen*, 351 F.3d at 51. Rather, Defendants may challenge through cross-examination whether "all" designs were displayed in RFMAS's show-

---

**11.** Contrary to RFMAS's argument, the evidence it supplies in support of access does not establish that Defendants admitted to seeing the nine Stella Pieces in Neiman Marcus or in RFMAS's showroom. At most, the evidence establishes only that Defendants admitted they were in RFMAS's showroom or in Nei-

man Marcus and saw RFMAS's "jewelry." (*See* RFMAS Exs. 8, 10, 27.) RFMAS provides no evidence other than its own conclusory, self-serving statements, however, that Defendants' had specific access to each of the nine Stella Pieces in RFMAS's showroom or at Neiman Marcus.

room and the factfinder should determine whether Defendants had a "reasonable opportunity" to view each of the nine Stella Pieces at issue in this litigation on the days that Defendants or their representatives visited the showroom.

RFMAS further supports its allegations of access through evidence of magazine advertisements and distribution of the Stella Pieces in stores. In *Yurman Design, Inc. v. Chaindom Enters., Inc.*, the court found access based on the plaintiff's display of the contested work at international jewelry shows, sales of the item in department and jewelry stores, and advertising campaigns. No. 99 Civ. 9307, 1999 WL 1075942, at *6 (S.D.N.Y. Nov.19, 1999). While sufficient sales and advertising can establish access, RFMAS does not clearly match up its submitted evidence of sales or advertisements with each of the nine registered Stella Pieces at issue.

The Court therefore elects to take the prudent course of denying RFMAS's motion for summary judgment on this issue, and, if this issue proceeds to trial, requiring RFMAS to present evidence of access as to *each* of the nine registered Stella Pieces. Evidence that one piece was accessed does not by itself constitute evidence that other pieces were accessed. *See, e.g., Taylor Corp. v. Four Seasons Greetings LLC*, Civ. No. 01–1293, 2003 WL 23527789, at *3 (D.Minn. Dec.11, 2003) (finding access because defendant had access to each of plaintiff's works).

### 2. *Substantial Similarity*

RFMAS next alleges that the Stella Pieces and the Gate B9 pieces are substantially similar. RFMAS does not provide analyses or comparisons of each of the nine Stella Pieces at issue, but rather alleges that it should be the beneficiary of an adverse inference based upon Defendants' alleged spoliation of evidence. RFMAS provides a side-by-side analysis of only one piece—the large-link necklace—and asserts that "it is apparent a reasonable fact finder would find the parties' large link pieces have the same 'total concept and feel.'" (RFMAS/So Mem. at 15–16.) Relying on this one comparison, RFMAS asks the Court to infer that any of Defendants' pieces that are unavailable for direct comparison based on Defendants' alleged destruction of samples would also be substantially similar. (*Id.*)[12]

As the Court has already concluded that any determination regarding spoliation should be made by Judge Dolinger, it is inappropriate for the Court to make any findings concerning of substantial similarity of the Stella and Gate B9 pieces stemming from any alleged spoliation. Rather, the Court will address whether the Stella

---

**12.** In various exhibits submitted to the Court, RFMAS presents side-by-side photographs of other Stella and Gate B9 pieces. (*See, e.g.,* RFMAS Exs. 67–71.) However, RFMAS provides no analysis comparing these pieces. Further, the So Defendants allege that several of these additional comparisons feature Stella Pieces that are not in the Registration's deposit. (*See* So Reply at 7–8.) RFMAS cannot seek protection for a work for which it does not hold a valid copyright. *See Jorgensen*, 351 F.3d at 51. This is one more factual dispute of a material issue that must be resolved, making summary judgment inappropriate in this case.

In addition, while the So Defendants represent that several of the Gate B9 pieces are not available for physical comparison, as their items were generally made to order, they also represent that they are able to manufacture samples for direct comparison. (*See* So Mem. at 8–9.) The Court will address the possibility of such manufacture at a later date; for the purpose of resolving the instant motions, it is enough for the Court to determine that, based on the record before the Court, disputed factual issues exist with regard to substantial similarity.

and Gate B9 pieces are substantially similar based on the evidence in the record.

"Because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.1980) (citations omitted).[13] "However, summary judgment for non-infringement is appropriate '[i]f the similarity concerns only noncopyrightable elements of [a copyright holder's] work, or no reasonable trier of fact could find the works substantially similar.' " *Business Mgmt. Int'l, Inc. v. Labyrinth Bus. Sols., LLC,* No. 05 Civ. 6738, 2009 WL 790048, at *16 (S.D.N.Y. March 24, 2009) (*quoting Matthew Bender & Co., Inc. v. West Pub. Co.,* 158 F.3d 693, 705 (2d Cir.1998)). When copyright protection "is limited to the particular selection or arrangement" of common elements from the public domain, as is the case here, "the protection given [the holder] is thin"; a competing work will not be found to infringe "so long as the competing work does not feature the same selection and arrangement." *Tufenkian,* 338 F.3d at 136 (*quoting Feist,* 499 U.S. at 349–51, 111 S.Ct. 1282); *see also Castaneda,* 591 F.Supp.2d at 485–86.

■ In copyright infringement cases concerning jewelry designs, courts have applied one of two tests: (1) the "ordinary observer" test; or (2) the "discerning observer" test. "The ordinary observer test asks 'whether the ordinary observer, unless he set out to detect the disparities [between the two works], would be disposed to overlook them, and regard their aesthetic appeal as the same.' " *Yurman*

*Design, Inc. v. Golden Treasure Imps., Inc.,* 275 F.Supp.2d 506, 516 (S.D.N.Y. 2003) (*quoting Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 765 (2d Cir.1991)) (alterations in original). "If an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work, then the two products are substantially similar. The fact-finder must examine the works for their 'total concept and feel.' " *PAJ,* 262 F.3d at 111 (quotation marks and citations omitted). However, "[w]hen a work contains both protectible and unprotectible elements, the inspection must be more discerning" and the "discerning observer" test applies. *Id.* (*citing Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir. 1995)). In doing so, the Court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the *protectible elements, standing alone,* are substantially similar." *Knitwaves,* 71 F.3d at 1002 (emphasis in original). "This more discerning test does not change the degree of similarity required, only what elements of the works are being compared." *Golden Treasure,* 275 F.Supp.2d at 516 (*citing Knitwaves,* 71 F.3d at 1002–03).

While courts are not in agreement as to which test is appropriate for jewelry designs, *compare M. Lady, LLC v. AJI, Inc.,* No. 06 Civ. 0194, 2007 WL 2728711, at *7 (S.D.N.Y. Sept. 19, 2007) (applying "ordinary observer" test to jewelry designs); *Golden Treasure,* 275 F.Supp.2d at 517 (same); *with Castaneda,* 591 F.Supp.2d at 496 (applying "discerning observer" test to jewelry designs), the Court is persuaded that the "ordinary observer" test is the

13. The So Defendants argue that the question of substantial similarity is one of law. (*See* So Mem. at 8.) This is incorrect. In *PAJ,* the Second Circuit held that while its review would be de novo if the district court had

made a determination of substantial similarity after a bench trial, "a jury's findings as to 'substantial similarity' are subject to the same deferential review under Rule 50 that applies to other jury findings." 262 F.3d at 111.

proper vehicle for determining whether the Gate B9 pieces are substantially similar to the Stella Pieces. As *Golden Treasure* explained,

> In this case, the plaintiffs' jewelry designs are not composed of protected and unprotected elements; rather, although the jewelry designs ... are created from a combination of common elements, the designs are protected in their entirety because it is the combination of elements that is copyrighted. The combinations of the common elements have resulted in designs that are original and protected in their entirety. It makes no sense ... to look at the designs by excluding elements such as cable and gemstones and consider what is left. Consequently, the plaintiffs would only have to satisfy the ordinary observer test and show that the ordinary observer would tend to overlook the similarities between the plaintiffs' and defendants' jewelry designs.

275 F.Supp.2d at 517. The Court agrees. In this case, the Court cannot distinguish protectible elements from unprotectible elements, as it is the arrangement and selection of common elements that give rise to the copyrightability of the Stella Pieces in their entirety. There is not one particular element to which RFMAS points that, alone, is original; it is only RFMAS's selection and combination of unoriginal elements that gives rise to any protection.[14]

Regardless of which test applies "a court must examine the 'total concept and feel' of the work," *Hogan v. DC Comics*, 48

F.Supp.2d 298, 309 (S.D.N.Y.1999) (*citing Knitwaves*, 71 F.3d at 1003), an assessment which "should be instructed by common sense." *Boisson*, 273 F.3d at 273. And again, in cases such as this where copyrightability is based only on selection and arrangement of common elements in the public domain, copyright protection is extremely "thin." *See Castaneda*, 591 F.Supp.2d at 485 ("When copyright protection 'is limited to the particular selection or arrangement' of common elements from the public domain, 'the protection given [to the holder] is thin.' " (*quoting Tufenkian*, 338 F.3d at 134)).

■ Whether the Court were to apply the "ordinary observer" or "discerning observer" test, the Court finds that factual disputes exist as to whether the Gate B9 pieces are "substantially similar" to the protectible elements of the one Stella piece available for comparison: the large-link Stella necklace pictured in RFMAS's memorandum. While the So Defendants point to discrepancies between the two works, the jewelry designs need not be absolutely identical. *See Castaneda*, 591 F.Supp.2d at 496–97 (finding that "no reasonable juror could find that defendants did not copy plaintiffs' protected works" because defendants' works were "identical or nearly identical to plaintiffs' in overall shape, style, and use and combination of design elements. Other pieces are not identical but are still substantially similar, differing only in the use of a different color gemstone or a slightly different combination of plaintiffs' distinctive design elements."

---

14. Of course, RFMAS may not claim to hold a copyright for the use of geometric forms in a necklace. *See William S. Geiger Corp. v. Gigi Accessories, Inc.*, No. 97 Civ. 5034, 1997 WL 458668, at *2 (S.D.N.Y. Aug.11, 1997) ("plaintiff has no right to copyright ... a common geometrical shape"); 47 C.F.R. § 202.1(a) ("familiar symbols or designs" are not subject to copyright protection). However, RFMAS may seek protection for the specific way it arranged the components of the Stella designs. *See Folio*, 937 F.2d at 765 ("Hence, what is protected in this case is the Folio Rose itself and the way in which *that* rose is arranged; the copyright umbrella does not cover the idea of arranging roses generally in a straight line pattern.").

(footnotes omitted)).[15] Here, unlike *Castaneda*, it is possible for a reasonable factfinder to conclude that the Gate B9 large-link necklace is not substantially similar to the Stella large-link necklace. *See Golden Treasure*, 275 F.Supp.2d at 517 (denying motion for summary judgment because "at a minimum there are genuine issue of material fact as to the similarity between the designs of the plaintiffs' jewelry and those produced by the defendants").

Such a result is all the more appropriate given that the Court does not have before it physical examples of the two large-link necklaces, and the photographic comparisons of the remaining works are not particularly large or clear. Under these circumstances, it is appropriate to allow the factfinder to determine whether the Stella and Gate B9 pieces are substantially similar. Accordingly, both RFMAS's motion and the So Defendants' motion for summary judgment on this issue are denied.

Finally, the So Defendants argue that even if the Stella and Gate B9 pieces are similar, So independently created her Gate B9 pieces. "Independent creation is an affirmative defense, evidence of which may be introduced to rebut a prima facie case of infringement," *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997), and it is a question of fact, *id.* at 891. The Court finds that this argument raises yet another instance where a genuine dispute of material fact exists, precluding summary judgment.

### 3. *Liability of the Richemont Defendants for Copyright Infringement*

Even if a factfinder were to determine that the Gate B9 designs are substantially similar to the protectible elements of the Stella designs, and that the So Defendants should be liable for copyright infringement, a separate question exists as to whether the Richemont Defendants are also liable for any possible infringement. The Richemont Defendants argue that they are not liable for copyright infringement under the theory of direct infringement or indirect infringement, and that the claim for copyright infringement against them should be dismissed as a matter of law.

The Court agrees that the Richemont Defendants cannot be held liable for direct infringement of the Stella Pieces on the record before the Court; however, issues of fact prevent the Court from making a determination as a matter of law as to whether the Richemont Defendants can be held liable for indirect infringement.

#### a. *Direct Infringement by the Richemont Defendants*

The Richemont Defendants assert that there is no genuine issue of material fact regarding their liability for direct copyright infringement. Their arguments regarding direct infringement differ from the So Defendants' arguments. The So Defendants admit that they took steps to create and promote the Gate B9 pieces, but argue that those pieces do not infringe the Stella Pieces. While the Richemont Defendants also dispute that the Gate B9 pieces are infringing and join the arguments made by So Defendants, the Richemont Defendants focus their own arguments on whether they took any actions that would constitute direct infringement.

To be held liable for direct infringement under the Copyright Act, a party must be found to have violated one of the copyright

---

**15.** Even though the works need not be absolutely identical, the Court recognizes that "[w]here the quantum of originality is slight and the resulting copyright is 'thin,' infringement will be established only by *very close copying.*" *Beaudin v. Ben & Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir.1996) (emphasis added).

owners' "exclusive rights," 17 U.S.C. § 501, which include the right to make copies, make derivative works, distribute copies to the public for sale or other transfer of ownership and publicly display the works, 17 U.S.C. § 106. The Richemont Defendants deny taking any actions that violated any of these exclusive rights.

■■ RFMAS alleges, upon information and belief, that the Richemont Defendants manufactured Gate B9 products in their facility in Italy. This allegation has not been substantiated by discovery and has actually been contradicted by the evidence. At his deposition, Scognamiglio admitted that he had only heard So and a Richemont executive mention a facility in Milan, but not necessarily in connection with the Gate B9 collection. (*See* Scognamiglio Dep. at 289–93.) Further, MSI has confirmed that it was the sole manufacturers of the Gate B9 collection and that the collection was handmade by MSI. (Margiotta Decl. Ex. 38 (Declaration of William Richardson, dated December 14, 2007 ("Richardson Decl.")), ¶¶ 3, 7.)

Second, the alleged manufacture by the Richemont Defendants took place abroad and, therefore, does not create liability for direct infringement under the federal copyright laws. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir.1988) ("It is well established that copyright laws generally do not have extraterritorial application.")

RFMAS also alleges that the Richemont Defendants are directly liable for infringement because MSI is part of an overarching Richemont group and, therefore, MSI's actions are attributable to the Richemont Defendants. Further, RFMAS attributes the allegedly infringing activities of non-defendant Richemont Japan to this larger Richemont entity. While RFMAS does not make an explicit legal argument regarding these allegations, RFMAS is ap-

parently requesting that the Court disregard the corporate structure of each of the Richemont Defendants and MSI and attribute the actions of any of these entities to the alleged "one Richemont" as a whole. The Richemont Defendants acknowledge that they are part of a larger group or corporations (the "Richemont Group"), but claim that the members of the group are all separately incorporated, independently run and distinct legal entities. As each of these entities is separately incorporated, this request is tantamount to a request to pierce the corporate veil. Although no party has moved for summary judgment on this issue, the question is necessarily implicated in the Richemont Defendants' motion for summary judgment as to direct infringement, as well as to some of the other issues before the Court on summary judgment. Therefore, the Court will address these issues as they apply to the motions currently before it.

■■ "Under New York choice of law principles, 'the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.' " *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) (alterations omitted) (*quoting Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir.1993)). MSI and RHI are Delaware corporations, while the other Richemont Defendants are foreign-incorporated entities. If RFMAS wishes the Court, when interpreting the corporate veil-piercing arguments, to apply the laws of the foreign countries in which some of the Richemont Defendants were incorporated, it is required to "give notice by pleading or other writing." Fed.R.Civ.P. 44.1. As it did not do so, the Court will analyze these allegations under Delaware, the state of MSI and RHI's incorporation, law whose "standards for piercing the corporate veil are substantially similar" to

New York law, which the Richemont Defendants cited in their reply to RFMAS's opposition. *Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 141 F.Supp.2d 412, 417 (S.D.N.Y.2001).

"Delaware law permits a court to pierce the corporate veil of a company 'where there is a fraud or where [it] is in fact a mere instrumentality or alter ego of its owner.'" *Fletcher*, 68 F.3d at 1457 (alteration in original) (*quoting Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del.Ch.1992)). RFMAS's allegations more closely resemble the latter, the alter ego theory, rather than the instrumentality theory. To succeed on an alter ego claim under Delaware law, a plaintiff must show that the two corporations "operated as a single economic entity" and that there is an "overall element of injustice or unfairness ... present." *Id.* (internal citations omitted).

RFMAS alleges that RHI's acquisition of a 40% interest in MSI formed a joint venture in which the Richemont Group had broad powers of control over MSI. RFMAS further alleges that the two Richemont executives who sat on MSI's board of directors reported directly to the head of the Richemont Group. The Richemont Defendants argue the purchase of a 40% interest in MSI was an investment and that So continued to run her business in the same manner that she had done prior to the acquisition, without the aid of Richemont executives. (*See, e.g.,* Declaration of Christopher Colfer, dated July 18, 2008 ("Colfer Decl."), ¶¶ 19–20; McQuigg Decl. ¶¶ 18, 24–2 6; Margiotta Decl. Ex. 36 (Deposition of Mimi So on March 6, 2008 ("So Dep.")) at 126–27.) They point to the term in MSI's LLC Agreement that allowed So to retain creative control of the company. (*See* MSI LLC Agmt. § 11.3(a).)

RFMAS also alleges that the Richemont Defendants are actually "one Richemont" that is centrally controlled. (RFMAS's Opposition to the Richemont Defendant's Memorandum of Law in Support of Summary Judgment, dated September 19, 2008, at 1–2.)

"[A] plaintiff seeking to persuade a Delaware court to disregard corporate structure faces 'a difficult task.'" *NetJets Aviation, Inc. v. LHC Comm'n*, 537 F.3d 168, 176 (2d Cir.2008) (*quoting Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ. A. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). A variety of factors may be examined to determine alter ego status, including whether the corporation was adequately capitalized, paid regular dividends, kept corporate records and observed other corporate formalities. *See id.* (*citing Harco*, 1989 WL 110537, at *4).

The Court finds that RFMAS has failed to provide sufficient evidence to support a finding that MSI was an alter ego of the Richemont Defendants, and, therefore, MSI's actions can not be attributed to the Richemont Defendants for purposes of a finding of direct infringement. MSI was a separately incorporated entity, and only two out of the five members of its board of directors were appointed by a Richemont company. While RHI invested in MSI, it held only a minority interest in the company. RFMAS has tacitly acknowledged the difference between MSI and the Richemont Defendants in moving for summary judgment against the two separately and on different theories.

In addition, RFMAS has failed make a showing that any "injustice or unfairness" would result should the corporate structure be respected. *Fletcher*, 68 F.3d at 1457. In fact, RFMAS has also accused the Richemont Defendants of vicarious and contributory infringement, theories by which the Richemont Defendants might be

held liable for the acts of MSI without a finding that they operated as alter egos. Therefore, while RFMAS has not demonstrated the economic unity required for a finding that MSI was an alter ego, their arguments regarding the control exerted by the Richemont Defendants over MSI can and will be considered during the analysis of their liability for contributory and vicarious infringement.

█ RFMAS also alleges infringement based on the distribution, sale and advertisement of Gate B9 pieces in Japan. These allegations all relate to the actions of non-defendant Richemont Japan. (Supplemental Declaration of Amedeo Scognamiglio, dated Sept. 18, 2008 ("Scognamiglio Supp. Decl."), ¶¶ 67–69 (stating that the infringing products were advertised on the "Richemont Japan website").) While RFMAS has raised certain questions regarding the formalities observed by some of the other separately incorporated Richemont Defendants, RFMAS has made no showing that Richemont Japan, a non-defendant, is an alter ego of any of the named Richemont entities. Even if Richemont Japan's actions created liability for the Richemont Defendants, the purchase of infringing products does not constitute infringement, see 17 U.S.C. § 106, and the sale of infringing products abroad does not constitute infringement under the Copyright Act. See Update Art, 843 F.2d at 73.

RFMAS argues that Richemont Japan can be held liable for the foreign sales because of the acts it undertook in the United States, specifically purchasing the infringing products. While there is an exception to the general rule regarding liability for acts taken abroad under the U.S. copyright law, that exception applies only "when the type of infringement permits further reproduction abroad—such as the unauthorized manufacture of copyrighted material in the United States."

*Id.* (internal citations omitted); *see also Palmer v. Braun,* 376 F.3d 1254, 1258 (11th Cir.2004) (holding that "it is only where an infringing act occurs in the United States that the infringement is actionable under the federal Copyright Act" (*citing Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 52 (2d Cir.1939) (additional citations omitted))). As the acts that allegedly took place in the United States—the purchase of infringing products—are not infringing acts, this exception does not apply.

Therefore, this issue involves no genuine question of material fact and the Court finds that the Richemont Defendants have not directly infringed on RFMAS's copyright.

### b. *Indirect Infringement by the Richemont Defendants*

The Richemont Defendants and RFMAS cross-move for summary judgement on the issue of the Richemont Defendants' vicarious and contributory infringement of RFMAS's protected material. "Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement." *Kuklachev v. Gelfman,* No. 08–CV–2214, 2009 WL 804095, at *4 (E.D.N.Y. March 25, 2009) (*citing Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1272 (Fed. Cir.2004)). As discussed above, the Court finds that the Richemont Defendants did not directly infringe on RFMAS's copyrights, and the Court finds that there are genuine disputes of material fact as to the So Defendants' alleged direct infringement. Therefore, to find any of the Richemont Defendants indirectly liable for infringement would be premature, as the Court has yet to find that there was direct infringement by any Defendant. Even if

it were not premature to do so, the Court would not summarily dispose of the indirect liability causes of action at this stage because factual disputes remain.

There is no motion before the Court that explicitly demands a ruling regarding the piercing of the Richemont Defendants' corporate veils; however, RFMAS's summary judgment motion against them asserts all claims against "Richemont" as a whole without distinguishing between the particular entities. RFMAS must prove each claim against each defendant or make a showing, as discussed above, that the actions of one are attributable to the others.[16]

The Court notes, however, that while the parties agree that each Richemont Defendant is separately incorporated, there do appear to be some lines that are blurred. For example, McQuigg, who was a central figure in the RFMAS and MSI interaction, was unclear about exactly which entity in the Richemont Group employed him. In his declaration, he describes himself as "a former Group Vice–President of Marketing and Director of Strategy within the Richemont Group of companies," but then goes on to speak about his "time at Richemont North America." (McQuigg Decl. ¶ 1.) At his deposition he was asked to explain which Richemont entity he had worked for and he responded that he "never worried about it, as long as [he] got [his] paycheck." (RFMAS Ex. 72 (Deposition of Edwin J. McQuigg on February 20, 2008 ("McQuigg Dep.")), at 18.) He went on to state that "Richemont is very complicated with regard to holding companies and ownership and all. So exactly where my compensation came from in the Richemont hierarchy of companies, I really don't

know." (*Id.*) Although he assumed he was employed by Richemont NA because he was physically located in New York City, he was sure his salary was not part of that entity's budget. (*Id.* at 18–19.) The Richemont Defendants' response to RFMAS's Statement of Material Facts ("SMF") states that McQuigg's title was Vice President of Group Marketing, Richemont NA. (Richemont Resp. SMF ¶ 64.)

Any assumption that McQuigg was employed by Richemont NA raises additional ambiguities. The parties agree that RFMAS entered into a non-disclosure agreement (the "Agreement"), signed by Scognamiglio and Colfer, who at the time was a Director of Richemont Int'l, on October 13, 2004. RFMAS has accused the Richemont Defendants of breaching the Agreement, as discussed below, and the Richemont Defendants have countered that it was signed only by Richemont Int'l and therefore no breach of contract claim can be asserted against the other defendants. Colfer recalls in his declaration that during the negotiation of the Agreement, Scognamiglio insisted that the term "outside the Recipient's (Richemont International, Inc.) group of companies" be eliminated from the end of paragraph 2 of the Agreement to read "Recipient agrees that it shall not disclose Information to third parties." (Colfer Decl. ¶ 7; Ex. 3 ¶ 2.) After the Agreement was finalized, Colfer suggested that RFMAS work with McQuigg to "come up with a proper business plan and financials for [Colfer] to assess." (*Id.* ¶ 9.)

In other words, Colfer had just negotiated a nondisclosure agreement with RFMAS on behalf of Richemont Int'l, the terms of which forbade Richemont Int'l

---

**16.** The Court notes that RFMAS's allegations seem to relate mostly to RHI and Richemont NA and there is a virtual absence of evidence regarding Richemont SA and Compagnie Financiere.

from disclosing information to other companies in the Richemont Group. Despite this restriction, Colfer then instructed RFMAS to work with McQuigg, an apparent employee of Richemont NA to develop a detailed business plan—a task that would necessarily involve disclosure of information to a representative of another Richemont entity. While Colfer stresses that he did not discuss the information he gained from RFMAS with anyone other than one of his employees and McQuigg and Angus (the business school intern working for McQuigg), discussions with McQuigg and Angus were discussions with parties outside of Richemont Int'l. (*See id.* ¶ 14.) It is these and other blurred lines, and RFMAS's allegations that the Richemont entities are alter egos of one another, that prevent the Court from parsing out the claims as they relate to each separate Richemont Defendant. The Court will refer in the following discussions to the particular entity implicated where possible; any ambiguities are a product of ambiguities the Court found in the parties' filings.

### i. *Vicarious Infringement by the Richemont Defendants*

■ Even when the indirect infringer has no knowledge of the direct infringement, it can still be held liable for vicarious infringement "if [it] has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971); *see also Faulkner v. National Geographic Soc'y*, 211 F.Supp.2d 450, 472 (S.D.N.Y.2002) ("Benefit and control are signposts of vicarious liability." (*citing Demetriades v. Kaufmann*, 690 F.Supp. 289, 293 (S.D.N.Y.1988))). RFMAS's arguments regarding the Richemont Defendants' alleged vicarious infringement rest mainly on the relationship of RHI and Richemont NA with MSI.

While nearly every fact in both RFMAS and the Richemont Defendants' SMFs is disputed by the opposing party, RFMAS and the Richemont Defendants seem to agree on the following: On or about December 31, 2003, RHI, a wholly-owned subsidiary of Richemont NA, contributed $6 million to MSI in exchange for 40% of MSI's stock. (*See* Margiotta Decl. Ex. 64 (Limited Liability Company Agreement of Mimi So Int'l, LLC ("MSI LLC Agmt.")).) This arrangement, referred to as a "joint venture" on its signature page, was approved by McQuigg. (RFMAS Ex. 56 (Faxed Signature page for MSI LLC Agmt. signed by McQuigg, dated Dec. 30, 2003).) As part of the joint venture, RHI was given the power to appoint two of the five Directors on MSI's board. (MSI LLC Agmt. § 10.2.) In 2005, MSI borrowed an additional $4.5 million from Richemont NA. (RFMAS Ex. 52.) However, RFMAS and the Richemont Defendants disagree about the financial interest and control the joint venture and subsequent loans gave the Richemont Defendants.

While RHI admittedly had a 40% interest in MSI, and Richemont NA had extended MSI $4.5 million in loans, the Richemont Defendants assert that they had no specific financial interest in MSI's alleged infringing activities. However, Richemont NA and RHI both had significant financial stakes in MSI and did stand to gain from the successful sale of MSI's products, which included the items from the Gate B9 collection alleged by RFMAS to be infringing. However, the question of the Richemont Defendants' right and ability to supervise the infringing activity raises factual disputes between the parties; therefore, summary judgment regarding vicarious infringement is not appropriate.

RFMAS points to the powers reserved for RHI in MSI's LLC Agreement as evi-

dence of the control the Richemont Defendants held over MSI. (*See* MSI LLC Agmt. §§ 9.2(c)–18.3(c)(ii).) These powers included the right to pre-approve any distributorship, manufacturing or license agreements with companies So had not historically used or companies not affiliated with Richemont. (*See id.* § 9.2(c)(xiii).) Approval was required for new production facilities and delegation of creative process if non-Richemont affiliates were used. (*See id.* § 9.2(c)(xv), (xvi).) In addition, RFMAS points to the two MSI Directors RHI had the power to appoint. (*See id.* § 10.2.) RFMAS also argues that the $4.5 million in loans that Richemont NA extended to MSI which, in the event of a default by MSI, allowed Richemont NA to convert its default amount into a member interest, put that company in a position of power and control over MSI. (RFMAS Ex. 52, § 4.2.) RFMAS also cites to the Richemont Group's website, which states that the Richemont Group, while comprised of a number of separate entities, has a structure in place to "provide central controlling and support services in terms of distribution, finance, legal and administrative services." (RFMAS Ex. 59.) Lastly, RFMAS highlights testimony from McQuigg regarding the Richemont Group's usual supervision of brands it develops and supports to bolster its claim that whatever the formal relationship, in practice the control exercised by the Richemont Defendants over MSI was extensive. (*See* McQuigg Dep. at 35–38.)

The Richemont Defendants argue that the joint venture was more of an investment in So and her company, which So ran independently. Their executives have attested to the fact that no company in the Richemont Group exerted control over MSI. (*See, e.g.,* Colfer Decl. ¶¶ 19–20; McQuigg Decl. ¶¶ 18, 24–26.) They point to testimony by So that her relationship with RHI did not influence her work or

her business. (*See* So Dep. at 126–27.) They also assert that under the terms of the joint venture, So, the creative director of MSI, retained creative control of the company. (*See* MSI LLC Agmt. § 11.3(a).)

 The Court finds that, if there is a determination that the So Defendants directly infringed, genuine issues of material fact exist to the Richemont Defendants' vicarious liability such that a reasonable factfinder might or might not find the Richemont Defendants liable.

### ii. Contributory Infringement by the Richemont Defendants

 A contributory infringer is one "who, with knowledge of the infringing activity, induce[s], cause[s] or materially contribute[s] to the infringing conduct of another." *Warner Bros. Entm't, Inc. v. Ideal World Direct,* 516 F.Supp.2d 261, 267–68 (S.D.N.Y.2007) (*quoting Gershwin,* 443 F.2d at 1162). "[T]he standard for contributory infringement has two prongs—the 'knowledge' prong and the 'material contribution' prong." *Faulkner,* 211 F.Supp.2d at 473 (internal citations omitted). The "material contribution" given by the party to be held liable for contributory infringement must be substantial. *Id.* (*citing Livnat v. Lavi,* No. 96 Civ. 4967, 1998 WL 43221, at *3 (S.D.N.Y. Feb.2, 1998)). The "knowledge" prong is satisfied if the alleged infringer is shown to know or to have had reason to know of the infringement. *See Gershwin,* 443 F.2d at 1162. "Two types of activities that lead to contributory liability are: (i) personal conduct that encourages or assists the infringement; and (ii) provision of machinery or goods that facilitate the infringement." *Matthew Bender,* 158 F.3d at 706 (*citing ITSI T.V. Prods., Inc. v. California*

*Auth. of Racing Fairs,* 785 F.Supp. 854, 861 n. 13 (E.D.Cal.1992)).

While almost none of the facts listed in the SMFs is conceded to be "undisputed," the parties appear to agree that beginning in 2004, McQuigg met with RFMAS's principals to discuss the possibility of investing in RFMAS. (Declaration of Amedeo Scognamiglio, dated August 11, 2008 ("Scognamiglio Decl."), ¶¶ 6–12; Scognamiglio Supp. Decl. ¶¶ 7–18; McQuigg Decl. ¶¶ 5–7.) RFMAS shared some information with representatives of various Richemont Defendants, including McQuigg, Colfer, and Angus. (Scognamiglio Decl. ¶¶ 6–13; Scognamiglio Supp. Decl. ¶ 7; McQuigg Decl. ¶¶ 5–15; Colfer Decl. ¶¶ 1, 5–12.) During the period in which the Richemont Defendants were considering investing in RFMAS, McQuigg introduced Scognamiglio and Mennella to So and her husband, and arranged for them to meet at RFMAS's showroom. (Scognamiglio Decl. ¶¶ 11, 14–16; McQuigg Decl. ¶ 8.)

■ There are disputes as to the circumstances and timing of the Richemont Defendants' talks with RFMAS regarding possible investment, as well as to what information was shared during these meetings. RFMAS asserts that the Richemont Defendants learned about RFMAS's designs during their numerous meetings regarding the Richemont Group's potential investment. (*See* Scognamiglio Decl. ¶¶ 10–15.) RFMAS argues that knowledge of the infringement can be inferred from the fact that the Richemont Defendants (1) knew of RFMAS's designs through these meetings; and (2) knew of MSI's designs because MSI was RHI's joint-venture partner and its board included two RHI appointees. The Richemont Defendants contest that their meetings with RFMAS ever focused on specific jewelry designs. (*See, e.g.,* Colfer Decl. ¶¶ 10, 16.) As discussed in the previous section,

they also deny they were involved with MSI's designs.

RFMAS alleges two specific links between MSI and RFMAS: McQuigg and Colfer. McQuigg, an MSI board member and Richemont executive, was RFMAS's initial and primary contact from Richemont and he was the one who introduced So and her husband to RFMAS's principals. (Scognamiglio Decl. ¶¶ 11, 14–16; McQuigg Decl. ¶¶ 5–15; Colfer Decl. ¶¶ 5, 9.) Colfer served on the board of MSI and participated in investment talks with RFMAS. (Colfer Decl. ¶¶ 5–12, 19–20.) RFMAS argues that McQuigg and Colfer had knowledge of RFMAS's designs, because they went to RFMAS's showroom and were privy to RFMAS's confidential design information during their discussions. (Scognamiglio Decl. ¶¶ 7, 10–11, 14–15, 17; Scognamiglio Supp. Decl. ¶ 18.) RFMAS further alleges that McQuigg and Colfer were familiar with MSI's designs because they sat on MSI's board of directors and were Richemont executives. RFMAS further points to testimony by an MSI employee indicating that MSI presented its Gate B9 marketing plans to McQuigg prior to launching the ad campaign. (RFMAS Ex. 73 (Deposition of Kelley Smith on March 18, 2008 ("Smith Dep.")), at 95–109.) RFMAS asserts that it is reasonable to infer that McQuigg or Colfer suggested that So copy RFMAS's designs or encouraged her to copy them.

The Richemont Defendants counter that McQuigg does not remember attending the meeting he set up between So and RFMAS at RFMAS's showroom. (McQuigg Decl. ¶ 8.) Although McQuigg does remember viewing some of RFMAS's jewelry, his memory of their meetings was that they focused on the financial aspects of RFMAS. (*Id.* ¶¶ 6–13.) The Richemont Defendants assert that McQuigg was not involved in the design or marketing of

MSI's jewelry as a result of his position on its board of directors. (*See* McQuigg Decl. ¶¶ 24, 26; MSI LLC Agmt. § 11.3(a).) Colfer also states that his focus with RFMAS was on the financials of the company, not the designs. (Colfer Decl. ¶ 16.) He also believes that the Gate B9 collection was launched years after he left MSI's board of directors. (*Id.* ¶ 19.)

The Richemont Defendants argue that the introduction of the alleged infringer to the allegedly infringed designer is not enough for a reasonable factfinder to conclude that the Richemont Defendants substantially and materially contributed to the alleged infringement. While merely providing the opportunity to infringe is not a material contribution to infringement, RFMAS has submitted evidence of the Richemont Defendants' involvement beyond the introduction of So to RFMAS, as discussed above. RHI was admittedly engaged in a joint venture with MSI at the time of the alleged infringement. RFMAS offers some evidence that the Richemont Defendants assisted MSI in marketing and sales, and provided other support services for MSI. Scognamiglio's and McQuigg's memories of the meetings relating to potential investment differ as well.[17] The Court finds that there are genuine issues of material fact that prevent the Court from disposing of the issue of contributory infringement on summary judgment.

## E. *TRADE DRESS INFRINGEMENT*

The So Defendants argue that RFMAS's allegations of trade dress infringement must fail because RFMAS cannot provide admissible evidence to prove that (1) the trade dress at issue is distinctive; and that (2) the Stella collection's trade dress is confusingly similar to that of the Gate B9 collection. The So Defendants also argue that RFMAS's description of its trade dress is overly general and not properly articulated, and that the purported trade dress is functional.

RFMAS argues that the description it has provided of its trade dress is sufficient, that its trade dress is nonfunctional, and that questions of fact remain regarding secondary meaning and likelihood of confusion.

### 1. *Legal Standard*

Under Section 43(a) of the Lanham Act, a private cause of action exists against any person who "in connection with any goods . . . or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person. . . ." 15 U.S.C. § 1125(a). "The statutory protection of unregistered trademarks extends to trade dress." *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997); *see also PAJ*, 262 F.3d at 114.

"The concept of trade dress encompasses the design and appearance of the prod-

---

17. Further, Scognamiglio asserts that Mawicke admitted to him that MSI had "ripped off" RFMAS's designs—specifically, that McQuigg suggested to So that she copy RFMAS's successful designs. (Scognamiglio Dep. at 354–71.) Mawicke denies making such statements evidence. (*See* Declaration of Daniel Mawicke, dated September 18, 2006, ¶¶ 2–5.) The Richemont Defendants also argue that the conversation in question was a settlement discussion, so that even if Mawicke had made such a statement it would not be admissible. *See* Fed.R.Evid. 408(a). Scognamiglio disputes that the conversations he had with Mawicke had anything to do with settlement. (Scognamiglio Dep. at 354–71.) Given the factual disputes surrounding this statement, the Court does not consider it in its decision.

uct together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Fun–Damental Too,* 111 F.3d at 999 (*citing Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir. 1995)). "Trade dress 'originally included only the packaging, or "dressing," of a product,' but it has been expanded to encompass what is at issue in this case: the design or configuration of the product itself." *PAJ,* 262 F.3d at 114 (*quoting Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)).

*PAJ* is particularly analogous to the case at hand. There, the Second Circuit reversed a jury's finding of trade dress infringement and unfair competition arising out of the defendant's "manufacture and sale of jewelry featuring the use of twisted, multi-strand cable together with other design elements, including gemstones." 262 F.3d at 107. In discussing the legal standard guiding trade dress infringement claims for product designs, the Circuit Court warned:

> We exercise "particular 'caution,' when extending protection to product designs." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 380 (2d Cir.1997) (*quoting Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995)). Although the Lanham Act protects marks that "consumers are likely to rely upon in distinguishing goods," *Landscape Forms,* 113 F.3d at 380, "almost invariably, even the most unusual of product designs such as a cocktail shaker shaped like a penguin—is intended not to identify the source" of the product, "but to render the product itself more useful or more appealing," *Samara Bros.,* 529 U.S. at 213, 120 S.Ct. 1339, 146 L.Ed.2d 182. *See Restatement (Third) of Unfair Competition* § 16 cmt. b at 159 (1995)

> ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods."). And trade dress claims raise a potent risk that relief will impermissibly afford a level of "protection that would hamper efforts to market competitive goods." *Landscape Forms,* 113 F.3d at 380; *see id.* at 379 ("[T]he Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets."); *Jeffrey Milstein,* 58 F.3d at 33. While most trademarks only create a monopoly in a word, a phrase, or a symbol, "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Landscape Forms,* 113 F.3d at 380.

*Id.* at 114–15.

■ Because of these concerns, the Second Circuit requires that a plaintiff asserting trade dress rights in the design of a product: (1) "offer 'a precise expression of the character and scope of the claimed trade dress'"; (2) allege that "the claimed trade dress is non-functional"; (3) allege that "the claimed trade dress has secondary meaning"; and (4) allege that "there is a likelihood of confusion between the plaintiff's good and the defendant's." *Sherwood 48 Assocs. v. Sony Corp. of Am.,* 76 Fed.Appx. 389, 391 (2d Cir.2003) (*quoting Landscape Forms,* 113 F.3d at 381; *citing PAJ,* 262 F.3d at 115–16).

A plaintiff that satisfies these requirements "may seek trade dress protection for an entire product line, by establishing that the 'overall look' in each separate product is 'consistent.'" *PAJ,* 262 F.3d at 116 (*quoting Walt Disney Co. v. Good-Times Home Video Corp.,* 830 F.Supp. 762, 766 (S.D.N.Y.1993)). However, courts will scrutinize a claim that purports to cover a line of products with particular intensity.

As Circuit Court explained in *Landscape Forms,*

> [A] trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress. Furthermore, a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design. Accordingly, when protection is sought for an entire line of products, our concern for protecting competition is acute.

113 F.3d at 380 (citations omitted).

Mindful of these guiding principles, the Court next addresses the four requirements RFMAS must satisfy to allege a claim of trade dress infringement in the Stella collection.

### 2. *Articulation of Trade Dress*

In this Circuit, "a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress." *PAJ,* 262 F.3d at 116.[18] "A trade dress which is either generic, non-specific, or inconsistent among its products cannot be distinctive." *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.,* 292 F.Supp.2d 535, 542 (S.D.N.Y.2003). What a successful articulation must specifically include, however, is unclear.

In *National Lighting Co., Inc. v. Bridge Metal Indus., LLC,* 601 F.Supp.2d 556, 562 (S.D.N.Y.2009), which was postured as a motion to dismiss, the court determined that it is not sufficient to merely provide a "laundry list of the elements that constitute a ... design"; rather, the plaintiff must provide "a description of which of plaintiff's trade dress design elements are distinctive and how they are distinctive." Further, the court stated that "[a] conclusory reliance on the 'entire look of the product' does not fulfill the plaintiff's obligation to offer 'a precise expression of the character and scope of the claimed trade dress' under *Sherwood* and *Landscape Forms." Id.; see also Shevy Custom Wigs, Inc. v. Aggie Wigs,* No. 06 CV 1657, 2006 WL 3335008, at *5 (E.D.N.Y. Nov. 17, 2006) (holding that Shevy's "sweeping 'descriptions' in fact denote categories of features, not the features themselves"); *Elements/Jill Schwartz, Inc. v. Gloriosa Co.,* No. 01 Civ. 904, 2002 WL 1492197, at *6 (S.D.N.Y. July 15, 2002) (finding description of trade dress in product line to be so general that "plaintiff seeks protection for the idea .... as opposed to any particular design configuration employing these elements"); *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F.Supp.2d 273, 299 (S.D.N.Y. 2002) (finding description of product line which includes use of "unique fabric and color treatments, including ... bright colors and color combinations" and "the placement of various patches" to be too general).

In contrast, in *Fibermark, Inc. v. Brownville Specialty Paper Prods., Inc.,*

---

**18.** The Circuit Court has provided four justifications for this requirement: (1) "without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings"; (2) "no juror can evaluate secondary meaning, overbreadth, or non-functionality without knowing precisely what the plaintiff is trying to protect"; (3) "a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality"; and (4) "[c]ourts will ... be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *PAJ,* 262 F.3d at 117 (quotation marks and citations omitted).

No. 7:02–CV–0517, 2005 WL 1173562 (N.D.N.Y. May 11, 2005), the plaintiff, facing a motion for summary judgment, pointed to the overall look of its product and directed the court to pictures of the product. *Id.* at *5. The court noted that the plaintiff's alleged trade dress of its "mottled look" was not uniform from product to product, but that a "certain degree of mottling is a necessary consequence" of creating its products. *Id.* The court concluded that "there are triable issues of fact on this issue" because "a reasonable trier of fact could conclude that there is an overall, consistent look (albeit, not identical) from production to production." *Id.*

Finally, *Abercrombie & Fitch* presents a middle ground. There, the Court found that the proffered description of the elements of a product line's alleged trade dress was sufficiently articulated, although the Court disregarded one element that was described as only being "sometimes" present. *Id.*, 292 F.Supp.2d at 545–46; *see also Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F.Supp.2d 60, 70–71 (S.D.N.Y.2003) (accepting list of fourteen elements as adequately articulating plaintiff's trade dress); *Kaufman & Fisher Wish Co., Ltd. v. F.A.O. Schwarz*, 184 F.Supp.2d 311, 317–18 (S.D.N.Y.2001) (implicitly accepting list of seven elements as adequately articulating product design trade dress).

The guidance that emerges from these cases is that a plaintiff must provide a sufficiently specific articulation of the common distinctive elements of the product line's trade dress rather than sweeping, overly general descriptions that essentially corner the market on an idea. Merely pointing to pictures of a product line will not suffice. The elements specified as the trade dress must be present in every item in that product line; while minor variations are acceptable, the overall look must be consistent across all items of the claimed product line. *See, e.g., Abercrombie & Fitch*, 292 F.Supp.2d at 545–46 (disregarding element not present in all products in product line); *Elements/Jill Schwartz*, 2002 WL 1492197, at *6 ("[B]ecause the specific elements of the trade dress listed by the plaintiff are not present in all of the Elements frames and books, trade dress protection for these two lines of products is not appropriate. While minor variations may not prevent trade dress protection, the variability in the Elements designs is significant." (citations omitted)).

In response to an interrogatory, RFMAS described the trade dress of the relevant Stella line as follows:

Although it is impossible to describe the precise impression in words, we find these trade dress elements include, but are not limited to, the unique arrangement of large hand-twisted or apparently hand-twisted, non-uniform open links in a loose pattern of two or three sizes that form a chain conveying a stylized and appealing sense of sophisticated freedom and motion. The larger open rings of various sizes are both connected by and spaced apart by a group of smaller oval rings. The large rings are slightly twisted or have an appearance of being slightly twisted. Of course, the fact-finder will visually derive their impressions from the trade dress appearance of the Subject Works.

(Prescott Aug. Decl. Ex. 29 at 5.) RFMAS later elaborated:

We are known for our distinctive "look" that is really most understandable as a visual as in the photographs in Exhibits 67–70 to the Declaration of Steven Crosby. People identify this as a source even without knowing us. It can be technically described as a unique combination of large hand twisted [sic] open gold links and smaller non twisted [sic]

open gold links that are not uniform, in a loose pattern of two or three sizes that form a gold chain to give a sophisticated feeling of freedom and motion.

The particular elements we've defined are: 1) gold links, 2) open as rings, 3) of two or three sizes, 4) larger links being or appearing hand twisted [sic], 5) non uniform [sic], 6) larger open rings are both connected by and spaced apart by a group of smaller oval rings.

(Scognamiglio Supp. Decl. ¶¶ 19–20.)

RFMAS's articulations surpass those provided in *PAJ*, *Elements/Jill Schwartz* and *GTFM*. Nonetheless, the Court is aware that RFMAS's textual articulation, without more, could toe the line of slipping into a generic description. If such an articulation were all that is needed to describe the Stella line's distinctive elements, RFMAS could, in theory, seek to prohibit competitors from manufacturing necklaces featuring a "combination" of "gold links" of "two or three sizes," where the larger links appear hand-twisted and are separated by nonuniform, smaller oval rings. The Court can imagine works that do not resemble the Stella design, yet fall under the literal text of the articulation. This is especially troubling given the basic nature of the design and that RFMAS is hardly the only manufacturer of jewelry that features open gold links of various sizes. (*See, e.g.*, Prescott Aug. Decl. Ex. 28 (Deposition of Lisa M. Kazor on June 23, 2008), at 257–77 (testifying as to prevalence of competitors' gold-link chains containing hoops of various sizes that have been sold at Neiman Marcus, both before and during the time Neiman Marcus sold items from the Stella collection.))

However, in *PAJ*, the Second Circuit acknowledged the difficulties that a plaintiff faces in articulating an artistic "look" such as a jewelry design, and concluded that the plaintiff need not present a perfect textual articulation of its trade dress, but rather that the plaintiff must fairly put the defendant (and factfinder) on notice of the distinctive elements and features of the trade dress at issue. *See PAJ*, 262 F.3d at 117 ("The trade dress of works that are decorative or artistic may be harder to capture in words, and may need descriptions more broadly framed, or may need drawings; but the party seeking protection must nonetheless be able to point to the elements and features that distinguish its trade dress."). In other words, the Circuit Court understood that when a product line's trade dress involves a higher degree of decorative or artistic elements, the plaintiff may rely more heavily on pictures of the trade dress or on broader descriptions, as long as the plaintiff ultimately points to the distinctive elements. The Circuit Court later reiterated that the jury charge in a trade dress case need only be "sufficiently specific to require the jurors to focus on a common set of features and to allow them to evaluate secondary meaning, overbreadth, and functionality." *Coach, Inc. v. We Care Trading Co., Inc.*, 67 Fed.Appx. 626, 629 (2d Cir.2002).[19]

**19.** Also instructive is *Abercrombie & Fitch*, where the court supported its finding that the trade dress was adequately articulated by stating that

one court in this district explained recently that a "product's trade dress is not, in a legal sense, the combination of words which a party uses to describe or represent [its] 'total image.' Rather, the trade dress *is* that image itself, however it may be represented in or by the written word." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ. 11295, 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003) (emphasis in original). The overall image of [the product line] was adequately conveyed by means of pictures in the complaint. 292 F.Supp.2d at 545–46. Similarly, RFMAS's articulation and the pictures provided adequately convey the trade dress for

■ The Circuit Court's suggestion that a court accept a more "broadly framed" description in certain circumstances, such as jewelry designs, applies in this case. *Id.* In light of the guidance above, the Court finds that RFMAS's articulation of its trade dress places Defendants on fair notice of the supposedly distinctive elements of RFMAS's alleged trade dress, when coupled with the pictures of the items that represent the product line. The So Defendants' motion for summary judgment on this issue is therefore denied. However, the factfinder still must determine whether "there is an overall, consistent look" throughout the entire line and whether RFMAS's articulation properly describes that look. *Fibermark,* 2005 WL 1173562, at *5. And, of course, if the evidence at trial ultimately establishes that no rational juror could find that there is an "overall, consistent look" throughout RFMAS's entire product line, Defendants may move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) ("Rule 50(a)").[20]

Finally, the Court's determination of distinctiveness, which is discussed more fully below in the Court's discussion of secondary meaning, may further narrow the contours of the trade dress at issue. The Court's acceptance of RFMAS's articulation of its proposed trade dress is not equivalent to a determination that the entirety of the proposed trade dress is distinctive. The articulation serves to put Defendants (and the factfinder) on notice as to what the proposed elements of the trade dress are. The Court's determination of distinctiveness, however, serves to establish which elements of the proposed trade dress actually function to communicate source identification to consumers. In this case, it is possible that the elements of the Stella product line's trade dress that are ultimately protectible (if any) are narrower than RFMAS's articulation. *See, e.g., Henri Bendel, Inc. v. Sears, Roebuck and Co.,* 25 F.Supp.2d 198, 202 (S.D.N.Y.1998) ("At best, the protectable aspect of Bendel's alleged trade dress is its specific brown and white stripe pattern. Bendel's cannot claim the exclusive right to use vertically striped, plastic coated fabric and gold zipper pulls on cosmetic bags."). Such an outcome, however, should not be confounded with whether RFMAS has provided a sufficient articulation of its trade dress under *PAJ* and its progeny.

which RFMAS seeks protection, although such a finding offers no opinion on whether each product in the product line contains all of the elements described, whether there is an overall, consistent look, or whether the articulation properly describes that look. *Cf. New Colt Holding Corp. v. RJG Holdings of Florida, Inc.,* 312 F.Supp.2d 195, 206 (D.Conn.2004) (holding that plaintiffs adequately described trade dress because "any lack of clarity in Plaintiffs' descriptions stems from their attempts to claim the entire appearance of the [product] and the difficulty inherent in adequately describing all the requisite details").

20. RFMAS does not cite to any case law in support of its argument that the trade dress of its product line is protectible; rather, RFMAS contends that it "claims trade dress in these pieces as a group and individually, especially

the iconic large link necklace." (RFMAS's Memorandum of Law in Opposition to the So Defendants' Motion for Summary Judgment, dated September 19, 2008 ("RFMAS Opp. to So"), at 10.) However, RFMAS has provided only one trade-dress articulation, and has not provided separate articulations for the individual pieces. *Cf. Golden Treasure,* 275 F.Supp.2d at 510–11 (providing articulation of trade dress for twenty-four jewelry designs). In addition, the Amended Complaint refers only to one "distinctive trade dress." (*See* Amended Complaint ¶ 53.) However, because the So Defendants do not challenge RFMAS on this point, the Court declines to address whether RFMAS sufficiently states a claim for trade dress infringement as applied to the individual Stella pieces in addition to the product line.

### 3. *Functionality*

The So Defendants next argue that RFMAS cannot meet its burden of showing that its trade dress is not functional. According to the So Defendants, "to hold that the asserted trade dress is protectable would require that RFMAS can preclude anyone else from manufacturing, selling, or offering for sale any item which is made of a chain having varying sizes of twisted gold links," putting competitors at a significant disadvantage. (So Mem. at 16–17.) RFMAS, citing to expert declarations, counters that "[a]s a jewelry design, artistically created to be beautiful, the dress is non functional [sic], and so recognized." (RFMAS Opp. to So at 10.)

 Under Section 43(a), a defendant is not liable for trade dress infringement if the trade dress at issue is functional. *See Landscape Forms,* 70 F.3d at 254. A trade dress feature is functional "if it is essential to the use or purpose of the article or it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 166, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quotation marks omitted); *see also Cartier, Inc. v. Sardell Jewelry, Inc.,* 294 Fed.Appx. 615, 620 (2d Cir.2008) ("A product design is functional when 'certain features of the design are essential to effective competition in a particular market.'" (*quoting Landscape Forms,* 70 F.3d at 253)). Even if some individual elements of a trade dress are functional, "their arrangement or combination may be 'arbitrary, fanciful, or suggestive' and thus deserve trade dress protection." *Coach,* 67 Fed. Appx. at 629 (*quoting Jeffrey Milstein,* 58 F.3d at 32).

The So Defendants primarily argue that RFMAS's design is aesthetically functional because protection of such a design would preclude anyone from manufacturing or selling any piece of jewelry "which is made of a chain having varying sizes of twisted gold links." (So Mem. at 16.) However, as discussed above, the trade dress available to RFMAS in a legal sense is not the text that RFMAS uses to articulate its trade dress, but rather the overall image which allegedly serves as a source-identifier. *See Abercrombie & Fitch,* 292 F.Supp.2d at 545–46.

"[I]n order to establish aesthetic functionality, the defendants have to show that extending trade dress protection to the plaintiffs' designs would prevent the defendants from creating alternative jewelry designs that would compete in the marketplace." *Golden Treasure,* 275 F.Supp.2d at 512 (*citing Knitwaves,* 71 F.3d at 1006). Further, whether a trade dress is functional for purposes of the Lanham Act "is essentially a fact question." *Eliya, Inc. v. Kohl's Dep't Stores,* No. 06 Civ. 195, 2006 WL 2645196, at *4 (S.D.N.Y.2006); *see also Coach,* 67 Fed.Appx. at 629 (denying summary judgment because "the jury reasonably could have concluded that Coach's trade dress was not functional"); *E–Z Bowz, L.L.C. v. Professional Prod. Research Co., Inc.,* No. 00 Civ. 8670, 2005 WL 535065, at *9 (S.D.N.Y. March 8, 2005) (denying summary judgment because the evidence, "when viewed in the light most favorable to [the plaintiff], could lead a reasonable jury to conclude that the trade dress at issue, when considered as a whole, is non-functional").

 RFMAS has introduced evidence, in the form of expert declarations, that the trade dress at issue is not functional. (*See, e.g.,* RFMAS Ex. 92 (Declaration of Edward Lewand, dated September 17, 2008) ¶¶ 8–9; RFMAS Ex. 93 (Declaration of Steven Hansen, dated September 18,

2008) ¶ 13).[21] Based on these declarations, along with the remainder of the record and construing all inferences in RFMAS's favor, the Court finds that a rational factfinder could conclude that RFMAS's trade dress would not prevent others from creating alternative competitive jewelry designs or otherwise create a monopoly in the marketplace. The So Defendants' motion on this issue is therefore denied.

### 4. *Secondary Meaning*

"As opposed to other types of trade dress, such as packaging trade dress, a trade dress based on the design of a product can never be inherently distinctive. Instead, it must have acquired distinctiveness, otherwise known as secondary meaning, to be protected." *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F.Supp.2d 355, 363 (S.D.N.Y.2003) (*citing Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212–15, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *PAJ*, 262 F.3d at 115). Therefore, RFMAS must prove that the trade dress of the Stella product line has acquired secondary meaning to succeed on its claim of trade dress infringement.

■ "Trade dress has secondary meaning when 'the *primary* significance of the [trade dress] in the minds of the consuming public is not the product but the producer,' such that the trade dress tends to be associated not just with the goods or services but with a single, though possibly anonymous, source." *Golden Treasure*, 275 F.Supp.2d at 512–13 (*citing 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 815 F.2d 8, 10 (2d Cir.1987) (emphasis in original)). Relevant factors in determining

secondary meaning include: "(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use." *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir.1996) (*quoting Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir.1987)).

"[D]etermining secondary meaning is a fact-intensive inquiry that is generally avoided at the summary judgment phase." *Gross v. Bare Escentuals Beauty, Inc.*, No. 03 Civ. 3089, 2008 WL 2332307, at *5 (S.D.N.Y. June 4, 2008); *see also Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 169 (2d Cir.1991) ("The careful weighing of evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment.").

■ Here, RFMAS has submitted evidence to the Court that raises an issue of fact as to whether RFMAS has sufficiently proven the existence of secondary meaning in its trade dress at the time that the Gate B9 collection entered the market. For example, Scognamiglio stated in a declaration that RFMAS has "about $4 million dollars of sales of the pieces with the trade dress look over the years before the infringement started in the U.S. in September 2006." (Scognamiglio Supp. Decl. ¶ 37.). He also stated that RFMAS spent approximately $400,000 in 2003–2005 "in straight advertising of the trade dress" in various magazines, and that RFMAS has fostered relationships with fashion profes-

---

**21.** While the Court gives no credit to RFMAS's experts' legal conclusions, *see United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991), "[f]unctionality is a question of fact. The record contains competing expert opinions on the issue of functionality, either of which the jury could credit. That alone precludes summary judgment." *Keystone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F.Supp.2d 543, 562 (W.D.N.Y.2005). In addition, expert discovery in this case has not yet concluded, further buttressing this conclusion.

sionals and costume designers who have featured items from the Stella line in their works, with a focus on the elements of the alleged trade dress. (*Id.* ¶¶ 26–29.) RFMAS has also submitted evidence of other media coverage and attempts to plagiarize the trade dress. (*See id.* at ¶¶ 40–42.) Although the Court is aware that a declaration from a partial source attesting to secondary meaning "possesses very limited probative value," *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.,* 478 F.Supp.2d 340, 370 (E.D.N.Y. 2007), the documents provided in conjunction with Scognamiglio's declaration, considered alongside the entirety of the record and construing all inferences in RFMAS's favor, provide enough of an uncertainty to raise a genuine issue of fact as to whether the trade dress of the Stella designs acquired secondary meaning by the time the Gate B9 collection entered the public market. *See Golden Treasure,* 275 F.Supp.2d at 513 (finding the evidence presented "sufficient to establish the existence of genuine issues of fact with respect to the secondary meaning of the plaintiffs' trade dress").[22]

### 5. *Likelihood of Confusion*

■ The Second Circuit relies on eight factors in determining whether a likelihood of confusion exists in connection with trade dress infringement:

(1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress[es], (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group.

*Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1002–03 (2d Cir. 1997) (*citing Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961)). While "[q]uestions regarding the likelihood of confusion are normally factual in nature, . . . summary judgment is appropriate if the court is satisfied that the products . . . are so dissimilar that no question of fact is presented." *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 116 (2d Cir.1984).

■ Having considered the entirety of the evidence, the Court finds that the record before it is rife with questions of fact as to the likelihood of confusion, and summary judgment is thus inappropriate. There is no need for the Court to list out and discuss every *Polaroid* factor. Factual issues so permeate the inquiry, particularly given that both parties are sellers of gold-link jewelry, that the Court easily finds proper resolution of this issue to be best left in the hands of the trier of fact.

For example, the record contains factual disputes regarding anecdotal evidence of actual confusion (Scognamiglio Supp. Decl. ¶¶ 43–46) and the proximity of the pieces in the marketplace (*id.* ¶ 70). And as to Defendants' alleged bad faith, Judge Dolinger has not yet ruled on RFMAS's allegations of spoliation, which may influence such a determination.

---

**22.** The So Defendants point out that RFMAS has not introduced into evidence a consumer survey in support of secondary meaning. However, expert discovery has yet to close and RFMAS may seek to introduce such survey evidence at trial. This is just one more factor weighing against a summary judgment ruling on this issue. *See Coach Leatherware,*

933 F.2d at 169 ("The careful weighing of evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment. The case against summary judgment is even stronger where the opposing party has not been afforded an adequate opportunity to seek potentially favorable information.").

In addition, for the reasons described above regarding secondary meaning, issues of fact persist as to the strength of the Stella trade dress. While the So Defendants cite to *Judith Ripka Designs, Ltd. v. Preville*, 935 F.Supp. 237, 258 (S.D.N.Y.1996) for the proposition that the trade dress at issue uses elements common in the trade and not identifiable with a particular source, *Judith Ripka* was a bench trial, not a motion for summary judgment. *Id.* at 239. Further, it is of no consequence whether the individual elements in the Stella trade dress are common in the trade; the question is whether the combination of the articulated elements of the Stella trade dress, in its entirety and as a whole, functions as an indication of source. *See Inverness Corp. v. Whitehall Labs.*, 678 F.Supp. 436, 439 (S.D.N.Y.1987) ("[I]t is the 'combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public.'" (*quoting Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir.1981))).

 Finally, the Court reiterates that it is inappropriate to find that there is not a likelihood of confusion in this case when expert discovery has not yet closed. "[E]vidence of actual confusion is highly probative of the likelihood of confusion," and "[p]roof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion." *Medici Classics Prods. LLC v. Medici Group LLC*, 590 F.Supp.2d 548, 556 (S.D.N.Y. 2008) (quotation marks omitted). To find as a matter of law that no actual confusion

exists before expert discovery has closed is therefore inappropriate. The Court does not intimate that a survey is required in this case; rather, this is one more factor weighing against the So Defendants' motion for summary judgment on this issue.[23]

### 6. Liability of the Richemont Defendants for Trade Dress Infringement

The Richemont Defendants argue that they cannot be held liable for any claim of direct trade dress infringement because "there can be no material dispute of fact that the Richemont Defendants themselves never offered for sale, advertised, promoted or sold the Gate B9 collection in the U.S." (Richemont Mem. at 19.) The Richemont Defendants further argue that RFMAS has not adduced any evidence of contributory trade dress infringement, and that RFMAS does not appear to pursue such a claim in any of its filings to the Court.

### a. Direct Infringement by the Richemont Defendants

 The Court agrees that the Richemont Defendants cannot be held liable for direct trade dress infringement for the same reasons discussed at length with regard to RFMAS's claim of direct copyright infringement against the Richemont Defendants. RFMAS relies solely on the Richemont Defendants' alleged status as a "joint venturer" with the So Defendants for its claim, but as discussed above, RFMAS failed to adduce any evidence that the Richemont Defendants are an alter ego of the So Defendants or that the Court should otherwise disregard corporate for-

---

**23.** Because the Court has already determined that genuine issues of material fact exist as to RFMAS's trade dress infringement claim under the Lanham Act, the So Defendants' motion for summary judgment is also denied as to RFMAS's common law trademark infringe-

ment claim. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 494 (S.D.N.Y.2008) (elements required to prevail on a common law trademark infringement claim mirror those under the Lanham Act).

malities. Even if any sales by non-party Richemont Japan could be attributed to the Richemont Defendants, wholly foreign sales do not establish "use in commerce" under the Lanham Act. *See Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103 (2d Cir.1998). The Court therefore finds that the Richemont Defendants are not liable for direct trade dress infringement, and the Richemont Defendants' motion for summary judgment on this issue is granted.

### b. *Contributory Infringement by the Richemont Defendants*

The Richemont Defendants also allege that they are not liable for contributory trademark infringement. "A distributor who intentionally induces another to infringe a trademark, or continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, is contributorily liable for any injury." *Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 64 (2d Cir.1992) (*citing Inwood Labs. v. Ives Labs.,* 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). *Inwood* has been interpreted in this District "to impose liability for contributory trademark infringement beyond manufacturers and distributors of products." *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F.Supp.2d 463, 505 (S.D.N.Y.2008). In *Tiffany,* for example, the court looked "to the extent of the control exercised by eBay over its sellers' means of infringement." *Id.* at 506; *see also Kuklachev,* 2009 WL 804095, at *4 ("Liability has been extended to defendants supplying services (rather than products) in cases where defendants exercise 'direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark.'" (*quoting Tiffany,* 576 F.Supp.2d at 505)); *New York Stock Exch., Inc. v. Gahary,* 196 F.Supp.2d 401, 414 (S.D.N.Y.2002) (describing contributory trademark infringement as occurring "when one party supplies another with the means (e.g., product, labels, advertising) by which the other is able to infringe").

Ultimately, all those who knowingly play a significant role in furthering trade dress infringement are liable as contributing parties. *See Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 499–500 (S.D.N.Y.1968); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:19 (4th ed. 2009) ("Everyone who knowingly participates in the preparation, distribution and sale of infringing goods or services is potentially liable as a contributory infringer."). However, the standard for contributory trademark infringement is higher than that for contributory copyright infringement. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

Finally, as "*Inwood* requires a plaintiff to demonstrate that the defendant knows or has reason to know of a third party's trademark infringement," RFMAS can satisfy "the 'reason to know' standard ... by a showing that the [Richemont Defendants were] willfully blind to the infringing activity." *Tiffany,* 576 F.Supp.2d at 513 (citations and quotation marks omitted); *Cartier Int'l B.V. v. Ben–Menachem,* No. 06 Civ. 3917, 2008 WL 64005, at *12 (S.D.N.Y. Jan.3, 2008) ("A contributor who knew or had reason to know of the Lanham Act violations or was 'willfully blind' to the violations is liable for trademark infringement.").

The Richemont Defendants argue that RFMAS has not come forward with "evidence that the Richemont Defendants had anything to do with the creation, manufacture, promotion, or sale of the Gate B9 collection." (Richemont Mem. at 19.) However, testimony by an MSI employee

suggests that MSI presented its Gate B9 marketing plan and materials to McQuigg prior to launching the ad campaign, (Smith Dep. at 95–109), and a reasonable factfinder could infer that McQuigg or Colfer suggested that So infringe RFMAS's trade dress, encouraged her to infringe it, or was at least willfully blind in not stopping the infringing use of the trade dress. Further, as discussed above, RFMAS has raised a genuine dispute of material fact as to the amount and degree of monitoring and control the Richemont Defendants had over the So Defendants.

■■■ For these reasons, along with the lengthy discussion provided earlier in this opinion, the Court finds that the record in this case presents a genuine dispute of material fact on these issues, rendering resolution inappropriate at the summary judgment stage. *See, e.g., Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir.1991) ("[W]hether a defendant has been willfully blind will depend on the circumstances and, like intent itself, will generally be a question of fact for the factfinder after trial." (footnotes omitted)). Although the Court is aware that the standard for contributory trademark infringement is higher than that for contributory copyright infringement, pervasive factual disputes between the parties persuade the Court to adopt a prudent approach, particularly in light of the Court's mandate to weigh all inferences in RFMAS's favor on this issue. The Court therefore denies the Richemont Defendants' motion for summary judgment

on this issue. Again, if RFMAS does not elicit sufficient proof at trial in support of the Richemont Defendants' contributory trademark infringement, it may move for judgment as a matter of law pursuant to Rule 50(a).[24]

## F. *UNFAIR COMPETITION*

■■■ The So Defendants assert that they are entitled to summary judgement on RFMAS's claim of unfair competition. "In a common law unfair competition claim under New York law, the plaintiff must show either [1] actual confusion in an action for damages or [2] a likelihood of confusion for equitable relief." *ESPN, Inc. v. Quiksilver, Inc.*, 586 F.Supp.2d 219, 230 (S.D.N.Y.2008) (*quoting Jeffrey Milstein*, 58 F.3d at 35).

The Court has already determined that questions of fact exist as to whether there is a likelihood of confusion; therefore, the Court denies the So Defendants' motion with respect to whether RFMAS may seek equitable relief under its claim for unfair competition.

In addition, as discussed above, expert discovery has not yet closed and RFMAS may choose to conduct consumer surveys, which might be probative evidence of actual confusion. *See Medici Classics*, 590 F.Supp.2d at 556 ("Proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion."). The Court makes no finding as to whether the statements attesting to anecdotal evidence of actual confusion provided in Scognamiglio's declaration alone consti-

---

**24.** The Richemont Defendants also argue that the Court should not consider a claim of contributory trademark infringement because RFMAS did not separately assert this claim in its Amended Complaint. The Richemont Defendants point to no authority that such a requirement exists. Further, the Amended Complaint alleges that the Richemont Defendants had knowledge of the So Defendants

infringing sales, participated in the infringement, exercised control over the So Defendants, and supervised the So Defendants' sales. (Amended Complaint ¶¶ 34–38.) These allegations are sufficient to put the Richemont Defendants on notice of RFMAS's claim of contributory trademark infringement.

tute sufficient evidence of actual confusion. It is enough for the Court to determine that RFMAS has the opportunity to submit additional evidence of actual confusion in the form of consumer survey evidence, and the So Defendants' motion for summary judgment with respect to whether RFMAS may seek damages under its claim for unfair competition must therefore be denied.[25]

## G. MISAPPROPRIATION OF TRADE SECRETS

The Richemont Defendants assert that they are entitled to summary judgement on RFMAS's claim that the Richemont Defendants misappropriated trade secrets. "To succeed on a claim for misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999) (*citing Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993)). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* at 44 (finding that a client list indicating preferences can constitute a protectible trade secret) (internal quotations and citations omitted).

 The Richemont Defendants argue that they are entitled to summary judgment on this claim because RFMAS failed to state with specificity which trade se-

crets it is alleging the Defendants misappropriated. RFMAS argues that there is no requirement that they allege the trade secrets with specificity in their complaint, and that they have given the Defendants notice of which specific trade secrets they allege were misappropriated. The Court finds that RFMAS has sufficiently indicated the trade secrets the Richemont Defendants have allegedly misappropriated, and the Court agrees that there is no requirement that a plaintiff specify the particular trade secrets at issue in its complaint. *See Medtech Prods., Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 788–89 (S.D.N.Y.2008) (citing cases denying motions to dismiss where trade secrets were not alleged with particularity).

RFMAS alleges that the Richemont Defendants misappropriated secrets, including its sales and financial records, marketing plans, customer lists and preferences, and a list of preferred distributors. (*See* Scognamiglio Supp. Decl. ¶ 55.) Scognamiglio provides further detail about the specific information he shared with representatives of the Richemont Defendants that was later misappropriated. He claims that he shared with McQuigg and others from Richemont entities that the large-link necklace was at the center of their marketing, was their best-seller and that it was the foundation of their brand. (*See* Scognamiglio Decl. ¶ 10.) He also elaborated on the ways in which RFMAS followed the trends in the market as well as the personal and unique ways they promoted their product and trade dress. (*See id.* ¶¶ 10, 15; Scognamiglio Supp. Decl. ¶¶ 29, 56–58.)

The Richemont Defendants argue that the trade secrets that they believe form

---

**25.** The Court likewise denies the So Defendants' motion for summary judgment at to RFMAS's unfair competition claim under the Lanham Act. *See Tiffany*, 576 F.Supp.2d at

494 (elements required to prevail on a common law unfair competition claim mirror those under the Lanham Act).

the basis of RFMAS's claim are duplicative of the information on which RFMAS bases its copyright claims. Therefore, they conclude that RFMAS's misappropriation claim is preempted by federal copyright law. As discussed in a previous section, RFMAS is claiming that it has a valid and enforceable copyright for the design of its jewelry. However, the misappropriation claim is based on the sales data, marketing, customer preferences and distributor information that RFMAS claims it shared with the Richemont Defendants. These types of information are not covered by copyright law, and therefore the misappropriation claims are based on information other than the design of the jewelry and are not preempted by federal copyright law.

Lastly, the Richemont Defendants assert that RFMAS failed to make any showing that the alleged trade secrets were used in any way by the Richemont Defendants. RFMAS alleges that the Richemont Defendants used the information they gained while meeting with RFMAS regarding a potential investment to help MSI sell its Gate B9 collection. They assert that misappropriation can be inferred from the way in which Gate B9 positioned its large link necklace as a central marketing tool and used RFMAS's method for "creat[ing] an icon." (Scognamiglio Supp. Decl. ¶¶ 65; see also id. ¶¶ 63–64.)

 They further allege that the Richemont Defendants used the information they gained from RFMAS regarding its Japanese marketing strategy to aid MSI's sales in Japan. Scognamiglio alleges that McQuigg urged RFMAS to end its agreement with its Japanese distributor, stating that the Richemont Group could not invest in a company unless it would be the exclusive distributor. (Scognamiglio Supp. Decl. ¶ 68.) MSI later launched its Gate B9 collection in Japan and RFMAS alleges that the Richemont Defendants gained knowledge about RFMAS's keys to success in Japan and then shared this information with MSI. (Id. ¶ 69.) The Court finds that there are issues of fact that prevent summary judgment for the Richemont Defendants on RFMAS's claim for misappropriation of trade secrets.

## H. BREACH OF CONTRACT

 The Richemont Defendants move for summary judgment on RFMAS's claim that they breached a non-disclosure agreement the parties entered into when the Richemont Defendants were considering investing in RFMAS. In New York, the elements of a breach of contract claim are: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable . to the breach." *Wharton v. Duke Realty, LLP*, 467 F.Supp.2d 381, 393 (S.D.N.Y.2006) (*citing Marks v. New York Univ.*, 61 F.Supp.2d 81, 88 (S.D.N.Y.1999)).

The Richemont Defendants assert that the written agreement at issue was signed on behalf of only one Richemont Defendant, Richemont Int'l. As discussed above, although Colfer signed the confidentiality agreement on behalf of Richemont International, Inc., and in fact, Scognamiglio insisted on removing the term "outside [Richemont Int'l]'s group of companies" from the parties with whom the confidential information could be shared, representatives of other Richemont entities were given confidential information. (Colfer Decl. ¶ 7; Ex. 3 at 2.)

 There is some evidence that this circumstance may have been due to a representation that these entities were also bound by the confidentiality agreement or due to oral agreements RFMAS made with the representatives other Richemont enti-

ties. For example, after Colfer signed the agreement he instructed RFMAS to work with McQuigg in presenting a business plan to the Richemont Group. (Colfer Decl. ¶ 9.) It appears that McQuigg was an employee of Richemont NA, and therefore Colfer's instruction that Scognamiglio work with him, implicitly instructing RFMAS to share confidential information about its business in order to prepare a business model, may have mislead RFMAS into believing that McQuigg was bound by the agreement or may have led RFMAS to make an ancillary oral agreement with McQuigg. Scognamiglio claims he was confused about the various entities and confidentiality. He claims that he was surprised when Colfer suggested a written nondisclosure agreement as he believed RFMAS already had an oral agreement with McQuigg. (Scognamiglio Supp. Decl. ¶ 51.) Scognamiglio was also confused when the proposed agreement was sent to him from a London office, but thought it might just be a different office of the same Richemont company. (Id.) McQuigg set RFMAS up to work with an intern that appears to have worked for Richemont NA on the business proposal package. (McQuigg Decl. ¶ 10.) RFMAS asserts that McQuigg also encouraged them to share confidential information with MSI by representing that So and her company were part of "Richemont." (Scognamiglio Decl. ¶¶ 12, 14–16.) Scognamiglio has alleged that each person to whom RFMAS divulged information agreed to keep the information confidential and did so on behalf of "Richemont." (Scognamiglio Supp. Decl. ¶ 50.) There are factual issues that remain regarding whether RFMAS had separate oral confidentiality agreements with these other entities and alternatively or additionally whether RFMAS was induced into believing that these entities were bound by the agreement.

■ The Richemont Defendants also argue that the written agreement contained a mandatory forum selection clause designating the United Kingdom as the jurisdiction for resolving any disputes arising under the agreement. (Colfer Decl. Ex. 3, ¶ 7.) Forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). RFMAS argues that the Court should decline to enforce the forum selection clause as enforcement would be inefficient because the rest of the claims will be litigated in this Court and discovery has already ended. However, "efficiency … concerns, without more, cannot generally justify the nonenforcement of a mandatory forum selection clause." *Indemnity Ins. Comp. of N. Am. v. K–Line Am., Inc.*, No. 06 Civ. 0615, 2008 WL 4922327, *8 (S.D.N.Y. Feb. 27, 2008).

■ RFMAS has also alleged that its principal who negotiated the clause and the agreement as a whole, did not understand what he was agreeing to and was overwhelmed by Richemont. Scognamiglio asserts that Colfer and McQuigg knew that RFMAS could not afford to hire a corporate attorney to review the contract and could "force" RFMAS to sign whatever they wanted. (Scognamiglio Supp. Decl. ¶ 52.) He claims that the email the Richemont Defendants claim is his specific assent to the forum selection clause, was actually sarcasm as he didn't understand the clause. (Id. ¶ 53.) The Court finds that these allegations raise a question of fact as to whether the forum selection clause is enforceable against Richemont Int'l. *See Indemnity Ins.*, 2008 WL 4922327, at *6 (listing circumstances under which forum selection clauses are unreasonable, including those implicating "over-

reaching" and "unfairness"). In addition, the forum selection clause would not apply to any ancillary, oral agreements that RFMAS may have made with any of the other Defendants. Therefore, summary judgment regarding the breach of contract claim is inappropriate.

## I. *UNJUST ENRICHMENT*

██ The Richemont Defendants moved for summary judgment on RFMAS's claim against them for unjust enrichment. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish that (1) the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir.2006) (*citing Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000)).

Again, the Richemont Defendants argue that RFMAS's claim is preempted by federal copyright law. The unjust enrichment claim, as it relates to the sales, marketing and other business information discussed in the section above relating to misappropriation, covers non-copyrighted material that is not subject to federal copyright law and is not preempted.

██ Second, the Richemont Defendants allege that RFMAS's unjust enrichment claim is based on the confidentiality agreement and therefore must be litigated in the United Kingdom. As discussed in the previous section, there are factual issues as to whether the forum selection clause is enforceable and, even if it is, it applies to only one of the Richemont Defendants. Therefore, the Court finds that summary judgment on the unjust enrichment claim is not appropriate.

## III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the Court's Order dated March 30, 2009, is amended to incorporate the discussion set forth in this decision; and it is further

**ORDERED** that the motion (Docket No. 97) of R.F.M.A.S., Inc. ("RFMAS") for summary judgment as to defendants Mimi So and Mimi So International, Inc. (the "So Defendants") is DENIED in its entirety; and it is further

**ORDERED** that the motion (Docket No. 97) of RFMAS for summary judgment as to defendants Richemont SA, Compagnie Financière Richemont SA, Richemont North America, Richemont Holdings I, and Richemont International, Ltd. (the "Richemont Defendants") is DENIED in its entirety; and it is further

**ORDERED** that the motion (Docket No. 89) of the Richemont Defendants for summary judgment is DENIED in part and GRANTED in part; and it is further

**ORDERED** that the motion (Docket No. 87) of the So Defendants for summary judgment is DENIED in part and GRANTED in part.

**SO ORDERED.**